**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ESTATE OF DERAMUS DEWAYNE LEMUEL, by and through its personal representative
Elizabeth Lemuel;
ELIZABETH LEMUEL, individually;
Z.D.-L.M.L., individually, a minor, by and through their legal guardian Elizabeth Lemuel;
D.J.L., individually, a minor, by and through their legal guardian Elizabeth Lemuel;
D.S.L., individually, a minor, by and through their legal guardian Elizabeth Lemuel; and
Z.A.T.L., individually, a minor, by and through their legal guardian Elizabeth Lemuel;

      Plaintiffs,

v.

EL PASO COUNTY, COLORADO[1];
ARMOR CORRECTIONAL HEALTH SERVICES, INC.;
DEPUTY DANIEL LEBARON, in his individual capacity;
DEPUTY BRITTANY STUBBS, in her individual capacity;
DEPUTY ANN BELL, in her individual capacity;
DEPUTY BRANDON BURGESS, in his individual capacity;
SERGEANT KIMBERLY MILLER, in her individual capacity;
SERGEANT JAMES RODRIGUEZ, in his individual capacity;
DEPUTY JOHN BRIENZA, in his individual capacity;
DEPUTY CHADWICK YOUNG, in his individual capacity;
SERGEANT CODY WRIGHT, in his individual capacity;
DEPUTY KEVIN THORPE, in his individual capacity;
NURSE DIANNA BEDIA, in her individual capacity; and
NURSE ROBIN BAUER, in her individual capacity;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

[1] "El Paso County, Colorado" is the correct name of the governmental entity Defendant. There is
a split of opinion among some judges in this district and elsewhere. Some judges require that
plaintiffs name the Board of County Commissioners and/or the sheriff in his/her official capacity
to name a Colorado county as a Section 1983 defendant. If the Court in this matter ultimately
requires Plaintiffs to name as Defendants the "Board of County Commissioners of El Paso
County" and/or "Sheriff Bill Elder in his official capacity" to sue El Paso County, or some other
entity in order to obtain municipal liability against El Paso County, Plaintiffs will substitute
parties and this shall serve as notice to those putative Defendants.

1

Plaintiffs, by and through counsel, Darold Killmer, Michael Fairhurst, Liana Orshan, and Reid Allison of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Complaint and Jury Demand as follows:

## I.      INTRODUCTION

1.      In the early hours of the morning of August 1, 2018, multiple officers of the El Paso County Sheriff's Office killed Deramus Lemuel.

2.      Prior to killing him, each officer knew that Mr. Lemuel had just been released from the hospital where he was treated for suspected methamphetamine poisoning, after which he was transported to the El Paso County Sheriff's Office's Criminal Justice Center ("CJC") in Colorado Springs, Colorado. On his arrival at CJC, Defendant Deputies and Defendant Nurse Bedia also observed obvious signs of Mr. Lemuel's altered condition due to methamphetamine intoxication.

3.      Despite his obvious impairment, Defendant Deputies shoved Mr. Lemuel to the ground when he attempted to comply with an order to lower himself to his knees after they had escorted him to an observation cell.

4.      Numerous Defendants Deputies then "dogpiled" on top of Mr. Lemuel, placing their body weight on him, wrenching his limbs behind his back while he lay on his stomach, and striking him with their knees and elbows. The Defendant Deputies also put Mr. Lemuel in limb restraints and forcibly manipulated him into the medically dangerous "hog tie" position.

5.      As Mr. Lemuel struggled to breathe in the dangerous position the Defendant Deputies had placed him, they cut off his clothing and bound his head in a spit hood. He was— more than justifiably—palpably terrified. For the several minutes that Mr. Lemuel managed to remain conscious, Defendant Deputies showed no sign of relenting. Ultimately, Defendant

Deputies' protracted and brutal use of force against Mr. Lemuel rendered him unconscious and naked, save for the spit hood and restraints.

6.     Mr. Lemuel stopped breathing and likely suffered a heart attack while he was restrained and held down by Defendants, and he may have suffered a stroke as well.

7.     Despite the fact that Mr. Lemuel's health and safety were obviously at severe risk during the incident, Defendant Deputies and Defendant Nurses indefensibly waited over four minutes after Mr. Lemuel fell unconscious before attempting CPR or any other life-saving actions.

8.     Deprived of oxygen through these vital minutes, Mr. Lemuel's brain suffered an injury from which he could not recover; though he was transported back to the hospital that same morning of August 1, 2018, he never regained consciousness.

9.     Mr. Lemuel died on August 14, 2018. The coroner determined that Mr. Lemuel's manner of death was "homicide."

10.     Defendants are liable for the death of Mr. Lemuel under the Fourth and Fourteenth Amendments to the United States Constitution based on their use of excessive force against Mr. Lemuel and their deliberate indifference to Mr. Lemuel's obvious and serious medical needs. Defendants are also liable for wrongful death under Colorado state tort law.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All

the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at all relevant times stated herein.

## III.    PARTIES

**Plaintiffs**

13.    At all times relevant to the subject matter of this litigation, the decedent, Deramus DeWayne Lemuel, was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. At all relevant times, Elizabeth Lemuel was the personal representative of the Estate of Deramus DeWayne Lemuel.

14.    Plaintiff Elizabeth Lemuel was Mr. Lemuel's wife when he was killed. At all relevant times, Ms. Lemuel was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

15.    Plaintiff Z.D.-L.M.L. brings this action by and through their parent and legal guardian, Elizabeth Lemuel. Plaintiff Z. D.-L.M.L. is a minor child of Mr. Lemuel, and Mr. Lemuel was one of Z. D.-L.M.L.'s legal guardians when Mr. Lemuel died. Plaintiff Z. D.-L.M.L. is a citizen of the United States and was at all relevant times a resident of and domiciled in the State of Colorado.

16.    Plaintiff D.J.L. brings this action by and through their parent and legal guardian, Elizabeth Lemuel. Plaintiff D.J.L. is a minor child of Mr. Lemuel, and Mr. Lemuel was one of D.J.L.'s legal guardians when Mr. Lemuel died. Plaintiff D.J.L. is a citizen of the United States and was at all relevant times a resident of and domiciled in the State of Colorado.

17.    Plaintiff D.S.L. brings this action by and through their parent and legal guardian, Elizabeth Lemuel. Plaintiff D.S.L. is a minor child of Mr. Lemuel, and Mr. Lemuel was one of D.S.L.'s legal guardians when Mr. Lemuel died. Plaintiff D.S.L. is a citizen of the United States

and was at all relevant times a resident of and domiciled in the State of Colorado.

18.     Plaintiff Z.A.T.L. brings this action by and through their parent and legal guardian, Elizabeth Lemuel. Plaintiff Z.A.T.L. is a minor child of Mr. Lemuel, and Mr. Lemuel was one of Z.A.T.L.'s legal guardians when Mr. Lemuel died. Plaintiff Z.A.T.L. is a citizen of the United States and was at all relevant times a resident of and domiciled in the State of Colorado.[2]

**Defendants**

19.     Defendant El Paso County is a political subdivision chartered under the laws of the State of Colorado and is a "person" subject to suit under Title 42 U.S.C. Section 1983. Among other things, El Paso County, through the El Paso County Sheriff's Office ("EPSO"), operates the El Paso County Criminal Justice Center ("CJC"), located at 2739 E. Las Vegas St., Colorado Springs, Colorado 80906.

20.     Defendant El Paso County is responsible for the oversight, supervision, discipline, and training of the law enforcement personnel at CJC.

21.     At all relevant times, Defendant El Paso County had a nondelegable duty to provide adequate medical care to inmates and detainees at CJC. El Paso County is liable under the nondelegable duty doctrine for the deliberate indifference of Defendant Armor Correctional Health Services and its employees or contractors.

---

[2] Colo. Rev. Stat. § 13-21-201, known as the Wrongful Death Act, creates a single wrongful death claim that may be brought by a decedent's surviving spouse and children. Regardless of who brings the claim, the decedent's surviving spouse and *all* his children have an interest in the judgment, and the party who brings the claim has an obligation to represent the rights of the non-named parties of interest. Thus, by naming as Plaintiffs Mr. Lemuel's surviving spouse and four of his children but not naming as Plaintiffs other children of Mr. Lemuel who may have an interest in the wrongful death judgment, Plaintiffs are not disclaiming the rights of all Mr. Lemuel's heirs at law to recover, and, to the contrary, are explicitly recognizing such rights.

22.     At all times relevant to the subject matter of this litigation, Defendant Daniel LeBaron was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at CJC.

23.     At all times relevant to the subject matter of this litigation, Defendant Brittany Stubbs was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed as a Deputy at CJC.

24.     At all times relevant to the subject matter of this litigation, Defendant Ann Bell was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed as a Deputy at CJC.

25.     At all times relevant to the subject matter of this litigation, Defendant Brandon Burgess was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at CJC.

26.     At all times relevant to the subject matter of this litigation, Defendant Kimberly Miller was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed as a Sergeant at CJC. At all relevant times, Defendant Miller had the authority and obligation to adequately train, supervise, oversee, and discipline all EPSO deputies who worked at CJC.

27.     At all times relevant to the subject matter of this litigation, Defendant James

Rodriguez was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Sergeant at CJC. At all relevant times, Defendant Rodriguez had the authority and obligation to adequately train, supervise, oversee, and discipline all EPSO deputies who worked at CJC.

28.     At all times relevant to the subject matter of this litigation, Defendant John Brienza was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at CJC.

29.     At all times relevant to the subject matter of this litigation, Defendant Chadwick Young was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at CJC.

30.     At all times relevant to the subject matter of this litigation, Defendant Cody Wright was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Sergeant at CJC. At all relevant times, Defendant Miller had the authority and obligation to adequately train, supervise, oversee, and discipline all EPSO deputies who worked at CJC.

31.     At all times relevant to the subject matter of this litigation, Defendant Kevin Thorpe was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed as a Deputy at CJC.

32.     Defendants LeBaron, Stubbs, Bell, Burgess, Miller, Rodriguez, Brienza, Young, Wright, and Thorpe are collectively referred to herein as "Individual EPSO Defendants."

33.     Defendant Armor Correctional Health Services, Inc. ("Armor") is a privately-owned Colorado corporation with its principal address located at 4960 SW 72nd Ave., Ste. 400, Miami, Florida, and its registered agent in Colorado, C T Corporation System, located at 7700 E. Arapahoe Rd., Ste. 220, Centennial, CO. At all times relevant to the subject matter of this litigation, Armor contracted with El Paso County to provide medical services to inmates at CJC. At all relevant times, Armor was acting under color of state law and performing a central function of the state.

34.     Defendant Armor is a private corporation, and thus neither it nor any of its employees or contractors are entitled to any immunity under the Colorado Governmental Immunity Act on Colorado state law claims or qualified or any other immunity on the federal law claims.

35.     Defendant El Paso County and Defendant Armor are collectively referred to herein as the "Entity Defendants."

36.     At all times relevant to the subject matter of this litigation, Defendant Dianna Bedia was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as an intake nurse at CJC, who was employed by Armor.

37.     At all times relevant to the subject matter of this litigation, Defendant Robin Bauer was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and employment and under color of state law in her capacity as a charge nurse at CJC, who was employed by Armor.

38.     Defendants Bedia and Bauer are collectively referred to herein as "Medical Defendants."

## IV.     FACTUAL ALLEGATIONS

**Deramus Lemuel was a father, husband, son, and brother.**

39.     Deramus Lemuel was born on March 4, 1980, to Kenneth and Marva Lemuel. He grew up in Colorado Springs, Colorado, with six siblings: Joshua, Aaron, Yvette, Kendra, Salina, and Kevin.

40.     Mr. Lemuel attended Harrison High School in Colorado Springs, where he was a basketball all-star. He also excelled at football.

41.     In addition to his love for basketball and football, Mr. Lemuel also had a passion for music; cooking (his favorite foods were seafood and steak); detailing cars; designing clothes; and playing chess, dominos, and cards.

42.     Mr. Lemuel married his wife Elizabeth on July 17, 2018. Mr. Lemuel had four daughters with Elizabeth: Z. D-L. M. L., who is approximately seven years old; Z. A. T. L., approximately five years old; D. J. L., approximately three years old; and D. S. L., approximately two years old.

43.     Mr. Lemuel also is survived by three other children: K. M.-L., approximately eighteen years old; T. M.-L., approximately fifteen years old; and T. F., approximately nine years old.

44.     Mr. Lemuel was a healthy 38-year-old man when he was killed by Defendants.

**Mr. Lemuel was arrested for alleged non-violent offenses.**

45.     In about June 2018, a warrant was issued for Mr. Lemuel's arrest. The warrant was based on his alleged failure to report to his parole officer on one occasion in May 2018.

46.     On July 31, 2018, at approximately 8:45 p.m., police officers stopped Mr. Lemuel in Colorado Springs, Colorado. Once the involved law enforcement officers determined that Mr. Lemuel had an outstanding warrant for a parole violation, they placed him under arrest.

47.     Law enforcement officers searched Mr. Lemuel's person incident to his arrest. They did not initially find any weapons or contraband on Mr. Lemuel's person, but then observed an open baggie of what the officers suspected to be methamphetamine powder inside his mouth.

48.     The officers asked Mr. Lemuel to spit out the baggie, which he did. A white substance was inside.

49.     The officers believed that there previously had been more methamphetamine in the baggie than the amount remaining when Mr. Lemuel spit it out.

50.     Since the officers believed that Mr. Lemuel had ingested methamphetamine, they drove him to UCHealth Memorial Hospital Central in Colorado Springs so that he could be medically assessed and potentially cleared for transport to the jail.

51.     At no time during the encounter with law enforcement did Mr. Lemuel threaten anyone, harm or attempt to harm anyone, resist arrest, or attempt to flee.

**Mr. Lemuel was medically evaluated and cleared at Memorial Hospital.**

52.     Mr. Lemuel arrived in the emergency department of Memorial Hospital at about 10:00 p.m. the same night of July 31, 2018.

53.     There, Mr. Lemuel underwent numerous tests to determine the effect of the suspected methamphetamine he had recently ingested.

54.     Hospital staff administered Ativan, which is a benzodiazepine that acts as a sedative, to stabilize his vitals and keep him calm. Ativan is a common treatment for

methamphetamine toxicity.

55.     Mr. Lemuel was kept in the hospital for monitoring because he continued to exhibit symptoms of methamphetamine intoxication, and there were concerns that he had ingested a potentially dangerous amount of methamphetamine.

56.     During the early morning hours of August 1, Mr. Lemuel lapsed into an obvious mentally and physically impaired state due to the methamphetamine he had ingested a few hours earlier.

57.     Peak blood methamphetamine concentrations typically occur about three hours after oral dosing. Effects of intoxication from methamphetamine can last from about four to fourteen hours.

58.     Common short-term effects of methamphetamine include increased activity and wakefulness, euphoria and rush, increased respiration, and increased heart rate and body temperature. Methamphetamine also can cause temporary delirium, panic, confusion, hallucinations, anxiety, and psychosis. Mr. Lemuel was obviously suffering many of those serious, adverse physical and mental effects when he was at the hospital and later, at CJC.

59.     At approximately 12:45 a.m., nurses at the hospital observed that it took three people to get Mr. Lemuel to walk, and he was sweating, shaking, and talking nonsensically.

60.     At approximately 1:10 a.m., nurses observed that Mr. Lemuel was communicating by mumbling, grunting, tossing his head, and experiencing muscle spasms and rigidity "secondary to methamphetamine use."

61.     Accordingly, at approximately 2:30 a.m., hospital staff administered Benadryl "to further calm [Mr. Lemuel]."

62.     Hospital staff cleared and discharged Mr. Lemuel at approximately 3:30 a.m. A

few hours before doing so, a nurse at the hospital contacted medical staff at CJC and notified them of Mr. Lemuel's condition. A CJC nurse responded that "[Mr. Lemuel] was ok to go to CJC."

63. Thus, medical personnel at CJC, including Defendant Bedia, had been informed of and were aware of Mr. Lemuel's ongoing substantial impairment before his arrival at CJC.

**Mr. Lemuel arrived at CJC in an obviously intoxicated and impaired state.**

64. Non-EPSO law enforcement officers transported Mr. Lemuel to CJC a little after 3:30 am.

65. It was obvious to the transporting officers that Mr. Lemuel remained in a very impaired condition because of his recent drug consumption. Accordingly, an officer radioed ahead to CJC to request assistance with Mr. Lemuel upon arrival. The officer specifically requested that a wheelchair be made available for Mr. Lemuel.

66. At a little before 4:00 a.m., Defendants Sergeant Kimberly Miller, Deputy Daniel LeBaron, Deputy Brittany Stubbs, Deputy Ann Bell, and Intake Nurse Bedia met Mr. Lemuel at the CJC sally port (the secured entrance to the jail).

67. Defendant Nurse Bedia was asked to meet Mr. Lemuel on his arrival to assist with escorting him inside. One of the officers who had transported Mr. Lemuel asked Defendant Nurse Bedia if CJC medical staff had been contacted by hospital staff in reference to Mr. Lemuel's medical situation, and she responded that they had been contacted and informed.

68. In addition to Defendant Nurse Bedia, the other Defendants who met Mr. Lemuel at the sally port already were aware—or very quickly became aware—of the fact that Mr. Lemuel was very physically and mentally impaired because he had recently ingested a large quantity of drugs.

69.    For example, Defendant Deputy Bell reported that Mr. Lemuel's fists were tightly clenched, and that his body was shaking uncontrollably when she observed him in the parole vehicle.

70.    Defendant Sergeant Miller had interacted on previous occasions with Mr. Lemuel, and believed she had developed a good rapport with him. Accordingly, she took the lead in handling Mr. Lemuel.

71.    Defendant Deputy LeBaron observed Sergeant Miller's efforts to get Mr. Lemuel's attention in the parole vehicle. Deputy LeBaron later reported that Mr. Lemuel was staring straight ahead of him and did not acknowledge or respond to Sergeant Miller at all, even when Sergeant Miller physically nudged Mr. Lemuel's legs with her foot. Deputy LeBaron observed that Mr. Lemuel's legs were rapidly twitching, his teeth were clenched, and his arm muscles were tensed.

72.    Deputy LeBaron then grabbed Mr. Lemuel's arm and "applied significant upward pressure" to get him to exit the vehicle. Deputy LeBaron noted that Mr. Lemuel required assistance to stand after being pulled from the vehicle.

73.    Defendant Deputy Burgess soon arrived on scene and also observed that Mr. Lemuel could not walk without assistance.

74.    Defendant Deputy Stubbs observed that Mr. Lemuel was sweating and did not verbally communicate at all during this entire interaction with CJC staff in the sally port.

75.    In response to Mr. Lemuel's obviously vulnerable condition, Defendant Nurse Bedia directed that he be changed into a safety smock.

76.    A safety smock is a single-piece fabric garment designed so that it cannot be tied into a noose, and it does not contain any zippers, buttons, and the like that the wearer might use

to harm himself. Defendant Nurse Bedia thus clearly knew that Mr. Lemuel needed to be treated with a heightened degree of care in order to accommodate his impaired condition.

77.     Nevertheless, other than her insistence that Mr. Lemuel wear the safety smock, Defendant Bedia did not attempt to provide any other medical assessment, diagnosis, care, treatment, or assistance to Mr. Lemuel. Instead, she insisted that he be placed in a garment for people who are a risk of self-harm, though she had no reason to believe that Mr. Lemuel was a danger to himself.

78.     Mr. Lemuel's need for additional care due to his impaired condition was also obvious to the other Defendants who observed Mr. Lemuel around this time.

79.     Subsequently, Defendants LeBaron and Stubbs transported Lemuel to Cell 3, a holding cell inside CJC, and placed him in the back of the cell.

80.     Mr. Lemuel was unarmed and did not harm anyone, attempt to do so, or make any aggressive movements whatsoever towards jail staff or anyone else at any time through his transport to Cell 3 and placement there.

81.     It remained evident to the Defendants at that time that Mr. Lemuel was not noncompliant or disobedient, but rather impaired. For example, describing Mr. Lemuel when he was placed in Cell 3, Defendant Deputy LeBaron reported that Mr. Lemuel had a vacant look in his eyes.

82.     It was obvious that Mr. Lemuel needed to be treated differently during the intake process than other detainees due to his physically and mentally impaired condition caused by the methamphetamine intoxication. This would have been in the best interests of jail personnel and Mr. Lemuel himself. It would not have been difficult or unduly burdensome to accomplish. It would not have fundamentally altered the jail's intake process.

83.     The Individual EPSO Defendants routinely dealt with people at CJC who were substantially impaired by drugs, including methamphetamine. These Defendants knew that such people frequently require a different approach—and are generally particularly vulnerable to suffering harm—relative to people who are accurately perceiving their environment.

84.     Mr. Lemuel was detained in a secure single person holding cell in a secure facility as of about 3:55 am. He was unarmed, and his wrists remained handcuffed together in front of him.

85.     Cell 3 can be locked, and no other offenders were in the cell when Defendants brought in Mr. Lemuel. The cell contained no toilet, no sink, and no bench; it was essentially just a concrete cube. There was a camera in the cell, the feed from which was monitored by EPSO officers around the clock.

86.     As the Individual EPSO Defendants knew, any potential security concerns surrounding Mr. Lemuel could have been easily and effectively addressed by keeping him locked in the surveilled, single-occupant cell on his own, until the lingering effects of his recent drug consumption abated, and he returned to ordinary functioning. This likely would have happened within a few hours.

87.     Alternatively, Mr. Lemuel could have been placed in the medical unit for observation and treatment.

88.     As another alternative, medical and correctional staff could have directed that Mr. Lemuel be returned to Memorial Hospital for observation and treatment.

89.     Instead, because of some apparent belief that Mr. Lemuel's clothes and restraints had to be changed at that very minute, the Individual EPSO Defendants subjected Mr. Lemuel to an unnecessary, brutal, and ultimately fatal beatdown.

**Defendants unnecessarily and brutally used overwhelming force against Mr. Lemuel.**

90.     Once Mr. Lemuel was secured in Cell 3, Defendants LeBaron, Bell, and Stubbs and numerous other Individual EPSO Defendant deputies apparently decided that the tasks of undressing Mr. Lemuel, dressing Mr. Lemuel in a safety smock, and moving Mr. Lemuel's handcuffs from the front of his torso to the rear were so urgent as to necessitate the use of devastating physical force to accomplish such tasks.

91.     Defendants Deputy LeBaron and Deputy Stubbs ordered Mr. Lemuel to lower himself to his knees. Mr. Lemuel slowly lowered himself toward the floor, plainly struggling to control his body.

92.     Mr. Lemuel was obviously still very impaired by his known recent drug use, including being extremely confused and disoriented. But despite his impaired state, he was not attempting to harm himself or others, trying to flee, or fighting or even attempting to fight Defendants. Mr. Lemuel plainly did not present a threat to anyone.

93.     Though Mr. Lemuel made no aggressive moves and was attempting to comply with the orders to lower himself to his knees, Defendant Deputy LeBaron seized Mr. Lemuel by the neck and shoulder and shoved him roughly to the floor.

94.     Defendants LeBaron, Stubbs, and Bell forced Mr. Lemuel into a face-down, prone position on the floor. This forced positioning trapped his still-handcuffed wrists (and hands) beneath his body and made it difficult for Mr. Lemuel to fully inhale and exhale.

95.     Then, Defendant Deputy Stubbs (estimated based upon video depiction to weigh at least 225 pounds) sat on Mr. Lemuel's upper legs while Defendant Deputy LeBaron (estimated to weigh at least 200 pounds) bore down with much of his weight on Mr. Lemuel's

back. This inflicted unnecessary pain on Mr. Lemuel and made it even more difficult for him to breathe.

96.    Defendant Deputy Bell (estimated to weigh 130 pounds), meanwhile, "assisted" Defendants Stubbs and LeBaron by torqueing and placing more pressure on Mr. Lemuel's legs, inflicting additional pain.

97.    Despite the extreme pain and fear this use of force caused Mr. Lemuel, at no point did he attempt to hit or kick any EPSO officer.

98.    At approximately 4:00 a.m., Defendant Deputy Burgess came to Cell 3 with wrist and leg restraints and a spit hood for Mr. Lemuel.

99.    A few moments later, Defendant Deputy LeBaron, without any provocation from Mr. Lemuel, delivered two powerful and violent knee strikes to Lemuel's right oblique area and two powerful elbow strikes to his shoulder area.

100.   Around the same time, Defendant Deputy Stubbs, also without any provocation, delivered two forceful palm heel strikes to Mr. Lemuel's right thigh.

101.   Then, while Mr. Lemuel remained face-down in a prone position, Defendant Deputies LeBaron and Burgess (estimated to weigh over 250 pounds) violently wrenched Mr. Lemuel's arms in an attempt to move his handcuffed wrists from in front of him to behind his back.

102.   Defendant Deputy LeBaron then placed his hand or elbow on Mr. Lemuel's upper back and (again) deliberately leaned most of his body weight into Mr. Lemuel's back and shoulders.

103.   This was plainly unnecessary and excessive, and further impeded Mr. Lemuel's already-restricted ability to breathe.

104.    The restriction on Mr. Lemuel's ability to breathe caused by the use of force and the infliction of other trauma was exacerbated by the existing and obvious impairment on Mr. Lemuel's breathing caused by the methamphetamine intoxication and the panic Mr. Lemuel was experiencing in response to these Defendants' actions.

105.    Despite Mr. Lemuel's distress and utter helplessness, Defendants Deputy Bell and Deputy Stubbs continued to unnecessarily and intentionally use substantial and excessive force against Mr. Lemuel, forcefully restraining his lower body by dangerously crossing his legs and—while Mr. Lemuel remained face-down on his stomach—violently wrenching them toward his waist.

106.    After manipulating Mr. Lemuel into what was essentially a hog-tied position, Defendant Deputy Stubbs pinned Mr. Lemuel with most of her body weight by bearing down her knees on his upper legs.

107.    As other Defendant deputies continued to apply unnecessary force and weight to Mr. Lemuel, Defendant Deputy Burgess then used a hypoglossal hold to intentionally inflict intense pain on Mr. Lemuel.

108.    A hypoglossal hold, generally used for the intentional infliction of pain to obtain compliance, involves placing pressure on the highly sensitive hypoglossal nerves located on either side of the head just beneath the lower jaw, and painfully pushing each nerve at a diagonal angle upward and toward the opposite side of the head. This level of force was plainly unnecessary under these circumstances, and Defendant Deputy Burgess utilized this technique solely for the purpose of inflicting pain on Mr. Lemuel rather than for any necessary penological purpose.

109.    Next, Defendants Deputy Burgess and Sergeant Miller (who was now on scene)

yanked a spit hood over Mr. Lemuel's head.

110.     At around the same time, even though at least four other Individual EPSO Defendants already were completely restraining and piled on top of Mr. Lemuel, Defendant Sergeant Miller chose to go hands-on with Mr. Lemuel as well, delivering a powerful elbow strike to his shoulder.

111.     In taking the actions described above, each involved Individual EPSO Defendant needlessly and wantonly subjected Mr. Lemuel to significant pain and terror through their extreme and unjustified application of excessive physical force.

112.     At no time when the Individual EPSO Defendants subjected Mr. Lemuel to the overwhelming physical force described herein was any physical force warranted, let alone the significant amount of force Defendants used. This was obvious to Defendants based on what they knew at the time. Mr. Lemuel had not harmed anyone, was not trying to flee (this would not have even been physically possible), and had not refused to comply with any commands.

113.     Defendants' interactions with Mr. Lemuel as described herein were influenced by implicit bias. "Implicit bias," an unconscious association of negative traits or stereotypes with a certain race, is a well-known phenomenon in law enforcement actions taken against African Americans. Part of the motivation for the use of extreme and protracted force against Mr. Lemuel by the Individual EPSO Defendants—the majority of whom are Caucasian—when no reason existed for the use of such force was the Defendants' conscious or subconscious assumption that African Americans are more likely to be dangerous and violent than individuals of other races. Indeed, it is almost impossible to understand the Defendants' brutal actions in response to Mr. Lemuel's passivity and compliance without accounting for implicit bias as a material component in the explanation.

114.    The cumulative amount of physical force the Individual EPSO Defendants intentionally applied to Mr. Lemuel—despite knowing that their co-Defendants were simultaneously subjecting him to similar force—was grossly excessive. Yet, they still kept crushing, beating, and suffocating him with escalating intensity and cruelty.

115.    The Individual EPSO Defendants intentionally and/or recklessly behaved in an unnecessarily dangerous manner. They knew Mr. Lemuel was in a particularly physically and mentally vulnerable condition and unable to mentally process events normally because of the effects of his recent drug ingestion. In this state, they knew that piling on top of him likely would further confuse and terrorize him. There existed no valid security, medical, or other reason for these Defendants to use force, much less the extreme force they used.

116.    Foreseeably, Mr. Lemuel responded to the involved Defendants' unprovoked assault of him with panic and horror.

117.    Mr. Lemuel faced his impending doom.  He thought he was going to die.

118.    He was right.

**<u>Defendants continued to unnecessarily and unjustifiably use substantial force against Mr. Lemuel, ultimately killing him.</u>**

119.    Defendant Deputies John Brienza, Chadwick Young, and Kevin Thorpe soon entered Cell 3 to join the ongoing assault.

120.    Defendants Deputies Brienza and Young (both estimated to weigh at least 200 pounds) intentionally and unnecessarily forcefully restrained Mr. Lemuel's legs, relieving Defendant Deputies Stubbs and Bell, who had previously been doing so.

121.    Defendant Deputy Young then tightly affixed leg restraints around Mr. Lemuel's ankles, for no apparent reason.

122.    Next, Defendant Deputy Thorpe proceeded to cut off and remove Mr. Lemuel's

shirt and shorts with a knife.

123.    By this time, approximately 4:07 a.m.—if not earlier—Mr. Lemuel had gone limp from the Individual EPSO Defendants' overwhelming application of force to him. He was clearly unconscious—and experiencing a medical emergency.

124.    At this point, the use of excessive force against Mr. Lemuel had already lasted for at least ten uninterrupted minutes.

125.    Despite knowing that Mr. Lemuel was unconscious, Defendant Deputies Burgess, LeBaron, Young, and Brienza continued to apply physical force, picking Mr. Lemuel up and rotating his body, then placing him again face down in the middle of the cell. Although Mr. Lemuel was obviously unconscious, these Defendants continued to deliberately apply unnecessary pressure to Mr. Lemuel.

126.    Defendant Deputies Brienza and Young next crossed and push Lemuel's legs up towards his back, putting him in the obviously dangerous (because of the known risk of asphyxiation) "hog tie" position.

127.    At no time when the EPSO Individual Defendants subjected Mr. Lemuel to the overwhelming physical force described above was any degree of physical force warranted, and certainly not the level of force actually inflicted. This was obvious to Defendants based on what they knew at the time. Mr. Lemuel was not harming anyone, trying to flee, or substantially refusing to comply with any commands.

129.    Any physical struggle Mr. Lemuel may have engaged in only occurred after Defendants first unnecessarily piled onto him and then subjected him to additional excessive force and was an instinctual human defensive response to the pain, panic, and fear he was experiencing due to his sense of being crushed and suffocated. That said, he was obviously not a

threat to any officer at any time.

128.     The collective, cumulative, and compounding effects of the many types of nearly simultaneous excessive force at least Defendants Brienza, Young, LeBaron, Burgess, Bell, Stubbs, and Miller had used on Mr. Lemuel, combined with his significantly restricted ability to breathe (as a result of Defendants' application of unnecessary weight and other restraints to Mr. Lemuel), placed extremely harmful strain on his body and, in particular, his cardiovascular and respiratory functioning.  The protracted use of excessive force and resultant extreme stress to Mr. Lemuel's system, which was already vulnerable due to his methamphetamine intoxication, ultimately killed Mr. Lemuel.

**Defendants were deliberately indifferent to Mr. Lemuel's serious and obvious medical needs.**

129.     Defendant Nurse Bedia observed the entire use of force against Mr. Lemuel from a vantage point just outside of Cell 3.

130.     Despite knowing that Mr. Lemuel was in extreme medical danger due to the use of force, Defendant Nurse Bedia failed to take any actions to intervene to ensure his medical and physical well-being. Then, even after it became apparent that Mr. Lemuel was unconscious and in need of immediate emergency care, Defendant Nurse Bedia failed to promptly provide him with necessary medical assistance.

131.     Just before 4:09 a.m, Defendant Nurse Bedia finally initiated the first medical evaluation of Mr. Lemuel. She checked his vital signs and could not detect a pulse. This was the first time anyone had checked any of Mr. Lemuel's vital signs even though it had been apparent for at least one to two minutes by this point that he was in the throes of a medical emergency because he was unresponsive and not breathing.

132.     Even though Defendant Nurse Bedia could not detect a pulse, she did not take any

immediate action in response to this knowledge.

133.     At about 4:09 a.m., Defendant deputies rolled Mr. Lemuel onto his side.

134.     Mr. Lemuel was obviously unresponsive and in need of immediate emergent medical care.

135.     Rather than providing or obtaining such care, Defendant Deputies Young and Brienza then uncrossed Mr. Lemuel's legs and pushed them toward his chest, which is a position known as "the Recovery Position" that is used when a patient is unconscious ***but only*** if he is still breathing.

136.     Indeed, Defendant Sergeant Rodriguez, who had been present for a substantial part of the use of force, noticed right before this point that Mr. Lemuel's eyes had rolled back and he didn't appear to be breathing. Yet Defendants proceeded with placing Mr. Lemuel in the Recovery Position, despite knowing that doing so would not remedy Lemuel's apparent lack of pulse or breathing.

137.     Defendants Deputies LeBaron and Burgess each attempted a sternum rub (which is not a medical treatment, but rather entails rubbing one's knuckles painfully up and down the middle of a patient's chest to attempt to wake him and/or determine his level of consciousness, or to determine whether the patient is "faking"), with no responsive movement from Mr. Lemuel.

138.     Shockingly, Defendants LeBaron and Burgess attempted the sternum rub at the behest of either or both Defendant Nurses Bedia and/or Robin Bauer, who, rather than provide any medical care in response to Mr. Lemuel's lack of pulse and breathing, indicated that deputies should administer a sternum rub—a tactic that provides no medical benefit when a patient is obviously unconscious and not breathing.

139.     Defendant Sergeant Cody Wright, who had watched much of the use of force

from right outside Cell 3, observed that Mr. Lemuel's muscles in his chest began to twitch at this point, and Defendant Deputy Young likewise observed twitching in Mr. Lemuel's chest, arm, and leg. "[Mr. Lemuel's] muscles [were] twitching over his pectoral muscles" at this point. Defendant Deputy Young similarly reported that, "[Mr. Lemuel's] body began to twitch from his arm to his chest and leg." These Defendants and the Medical Defendants knew that reflexive "twitching" is not a purposeful movement in response to pain, but rather indicated that Mr. Lemuel was in critical danger, as his brain was unable to receive the message of pain or unable to respond correctly to it.

140.    Neither Defendants Wright nor Young—nor any of the other individual Defendants then present in the cell—took any immediate action to address the life-or-death medical emergency Mr. Lemuel was clearly experiencing.

141.    Defendant Nurse Bauer had entered Cell 3 at about 4:09 a.m. or 4:10 a.m. She checked Mr. Lemuel's pulse and, like Defendant Bedia, did not detect any pulse. However, she failed to take any immediate action in response to this knowledge.

142.    At about 4:10 a.m., Mr. Lemuel's restraints were removed, and he was rolled from a fetal position on his side to his back.

143.    At about 4:11 a.m.—at least four minutes after Mr. Lemuel fell unconscious—Defendant Bauer finally started performing chest compressions (CPR) on Mr. Lemuel.

144.    This was the first attempt at medical treatment anyone at CJC provided to Mr. Lemuel.

145.    Thus, for at least two minutes after Defendant Nurse Bedia first knew that Mr. Lemuel did not have a detectable pulse, and at least 90 seconds after Defendant Nurse Bauer first knew that Mr. Lemuel did not have a detectable pulse, neither Medical Defendant—nor any

other individual Defendant present—took any action to provide, or otherwise cause Mr. Lemuel to receive, obviously needed emergency medical care.

146.     Outside medical assistance was not sought for Mr. Lemuel until about 4:12 a.m., when 911 was finally called.

147.     Defendant Brienza used a bag-valve mask (BVM) to try to assist Mr. Lemuel with breathing starting at about 4:12 a.m. This was the first time anyone had attempted to assist Mr. Lemuel with his breathing, even though he obviously had not been breathing as early as five minutes before then.

148.     At about 4:14 am, Defendant Deputy Stubbs brought an AED (automated external defibrillator) into the cell. Defendant Bauer applied its pads and electrodes to Mr. Lemuel's chest, but no shock was ever delivered because Mr. Lemuel had already "flatlined" – no heartbeat was detected.

149.     The Colorado Springs Fire Department and an ambulance arrived on scene, and at about 4:20 a.m., the Colorado Springs Fire Department began performing CPR on Mr. Lemuel in place of jail personnel and used epinephrine to restart Mr. Lemuel's heart.

150.     At about 4:32 a.m., Mr. Lemuel was placed on a gurney and taken out of the intake area.

151.     At about 4:39 a.m., an ambulance transported Mr. Lemuel from the jail back to Memorial Hospital.

152.     Mr. Lemuel never regained consciousness.

153.     All individual Defendants are responsible for the above-described undue and deliberately indifferent delay in emergency medical treatment for Mr. Lemuel. All Defendants observed Mr. Lemuel's obvious and serious medical needs, including the fact that he was

unresponsive, not breathing, and had no pulse, yet took no immediate action to treat those clearly emergent medical needs.

### **Defendants unconstitutionally failed to intervene to stop their Co-Defendants' excessive use of force on Mr. Lemuel.**

154. During the events described above, individual Defendants observed their Co-Defendants subjecting Mr. Lemuel to manifestly excessive force. Even so, they deliberately failed to intervene to stop it despite each having the opportunity to do so and knowing that the use of force was excessive and dangerous to Mr. Lemuel, and despite having a legal duty to intervene.

155. Specifically, Defendant Deputy Thorpe observed much (if not all) of the clearly excessive force described above from the hall outside of Cell 3. He took no action to try prevent the excessive force from occurring or continuing.

156. Defendant Sergeant James Rodriguez was present in the cell for a substantial part of the use of force, including the point at which Mr. Lemuel became obviously unresponsive. He did nothing to try to stop the use of excessive force, despite being an on-site supervisor and thus having the authority to command his subordinate officers to stop using force, and despite the fact that the use of force was obviously excessive.

157. To the contrary, the only actions Defendant Sergeant Rodriguez took during the use of force were ordering Defendants Young and Thorpe to assist Defendants Bell, Burgess, Miller, and LeBaron with placing restraints on Mr. Lemuel and supplying Defendant Thorpe with handcuffs and a knife for the purpose of cutting off Mr. Lemuel's clothing.

158. Defendant Sergeant Cody Wright was another supervisor on scene who observed much of Individual EPSO Defendants' clearly excessive use of force from just outside of Mr. Lemuel's cell and did nothing to try to intervene, despite having authority and obligation to

command his subordinate offers to stop subjecting Mr. Lemuel to unconstitutional force.

159. Further, Defendants LeBaron, Stubbs, Bell, Burgess, Miller, Brienza, and Young, in addition to personally subjecting Mr. Lemuel to excessive force, observed their Co-Defendants' excessive use of force, yet chose not to intervene despite having the opportunity and obligation to do so.

160. Moreover, like Defendants Sergeants Rodriguez and Wright, Defendant Sergeant Miller is also liable as a supervisor of the other Individual EPSO Defendants due to her authority as a supervisor, and is liable for failing to direct her subordinates to stop using force against Mr. Lemuel given her knowledge or constructive knowledge that the use of force was excessive and dangerous.

161. Lastly, Defendant Nurse Bedia is also liable for failing to attempt to intervene and stop the unlawful and dangerous use of force against Mr. Lemuel despite observing the entire use of force and having the opportunity and obligation to protect Mr. Lemuel from excessive risks to his health.

## The El Paso County Coroner concluded that Mr. Lemuel's "manner of death was homicide."

162. Following Mr. Lemuel's arrival back at Memorial Hospital on August 1, 2018, the hospital diagnosed him with cardiac arrest, lactic acidosis, severe hypoxic-ischemic encephalopathy, among other serious conditions.

163. Mr. Lemuel likely experienced a heart attack when he was restrained and held down by officers, and an MRI also showed signs of a stroke.

164. Lactic acidosis occurs when the body's formation of lactic acid outstrips its ability to remove it. During strenuous activity or struggle, and as a consequence of the infliction of trauma such as the lengthy use of force to which Defendants subjected Mr. Lemuel, there is a

dramatic increase in lactic acid in the blood, decreasing the pH of the blood (increasing the acidity of blood).

165.     The body's natural response to the blood's falling pH is to increase the rate and depth of breathing. Hyperventilation can partially offset the blood's decreasing pH, helping the body to maintain blood pH in the life-sustaining range. In Mr. Lemuel's case, the lengthy period of pressure and restraint exerted on his body, combined with the infliction of pain and fear and with the effects of the ingested methamphetamine, prevented him from hyperventilating sufficiently to fend off acidosis, and ultimately resulted in cardiac arrest.

166.     Hypoxic-ischemic encephalopathy is a brain injury caused by a lack of oxygen reaching the brain, leading to the death and impairment of brain cells. It is often a complication of cardiac arrest or consequent to suffocation.

167.     Mr. Lemuel remained on life support at the hospital for the next two weeks, but never regained consciousness. He passed away on August 14, 2018.

168.     The El Paso County Coroner's Office subsequently performed an autopsy on Mr. Lemuel, concluding that the manner of death was "homicide."

169.     The Coroner further concluded:

Based on the case history and autopsy findings, [it] is  our opinion that Deramus Lemuel, a 38-year-old Black male, died as a result of complications of global hypoxic/ischemic brain injury due to cardiac arrest **occurring in the setting of** illicit drug intoxication and **physical restraint by law enforcement.**

170.     Foreseeably, Defendants' unnecessary use of devastating physical force on Mr. Lemuel caused him to suffer massive and ultimately fatal injuries, including but not limited to global hypoxic/ischemic brain injury due to cardiac arrest (believed to have been caused by the acidosis resulting from Defendants' excessive use of force and restraint), and blunt force trauma.

171.     The blunt force trauma Mr. Lemuel suffered included but was not limited to

(according to the autopsy report) a "markedly swollen" scrotum; a 1/2 inch, scabbed area on the right ear; multiple irregular and linear scabbed areas, measuring up to ¾ inch, on the right leg; a ¼ inch, V-shaped scabbed area on the lateral right angle; a 3 x 1 ¾ inch area of contusion involving the intercostal muscles of three right ribs; and a 2 ½ x 1 ¾ inch area of contusion involving the musculature of the right lower back, overlying the contusion of the right intercostal muscles.

172.    Defendants' illegal conduct caused Mr. Lemuel's death.

173.    If Defendants had not subjected Mr. Lemuel to unnecessary and brutal physical force, he would have fully recovered from the short-term effects of his drug use and would not have died.

174.    Had Defendants promptly and appropriately responded to Mr. Lemuel's serious and obvious medical needs arising from the excessive force, he more likely than not would have survived.

175.    Though EPSO investigated the use of force against Mr. Lemuel, none of the Individual EPSO Defendants nor any other EPSO employee of received any discipline related to the killing of Mr. Lemuel.

176.    Likewise, despite the unconstitutional delay in emergency medical treatment for Mr. Lemuel, upon information and belief, no Defendants, including the Medical Defendants, were disciplined or counseled as a result of Mr. Lemuel's death.

177.    El Paso County, through the Sheriff's Department, trained the individual defendants to conduct themselves in the manner that they did with respect to Mr. Lemuel, and these defendants' actions were pursuant to the training, customs, practices and policies of the County.

**Defendant El Paso County's customs, policies, and/or practices relating to excessive force caused Mr. Lemuel's death and the violations of his constitutional rights.**

178.    El Paso County and the El Paso County Sheriff's Office have created, fostered, maintained, and tolerated an environment and culture responsible for the use of excessive force by EPSO officers against detainees at CJC.

179.    EPSO officers have engaged in a persistent practice of using excessive force, and the officials responsible for supervision, training, and creating and enforcing policies have consistently failed to adequately train and supervise EPSO officers in issues relating to the use of excessive force, as well as fail to discipline individual officers who have used excessive force against detainees. This deliberately indifferent custom, policy, and/or practice has led EPSO officers on a regular basis to inflict unjustified levels of force against CJC detainees.

180.    EPSO's deliberately indifferent policy, custom, and/or practice of condoning, encouraging, tolerating, rewarding and ratifying the use of excessive force has resulted in a custom or culture of EPSO officers using excessive force against detainees because EPSO has explicitly or implicitly communicated to EPSO officers, including Individual EPSO Defendants, that such force is authorized and, indeed, expected, and when used will be defended by the supervisory and municipal apparatus of El Paso County.

181.    The approval and defense by El Paso County of the use of excessive force by EPSO employees upon CJC detainees sends a clear and unequivocal message to those employees—it *trains* them—that such use of excessive force is acceptable, consistent with policy, and is approved practice, causing the use of such excessive force to be likely or even inevitable in the future.

182.    The Individual EPSO Defendants used unlawful force against Mr. Lemuel pursuant to El Paso County's custom, policy, and/or practice of unconstitutional conduct,

including using excessive force against CJC detainees; the failure of the EPSO to adequately train and supervise its officers regarding the use of excessive force; and the failure of EPSO to appropriately discipline EPSO officers who have engaged in excessive force.

183. The Individual EPSO Defendants' violation of Mr. Lemuel's Fourteenth Amendment right to be free from excessive force, standing alone, is sufficient evidence of El Paso County's custom, policy, or practice of unlawful excessive force because all ten officers acted in essentially the same unconstitutional manner. The sheer number of officers involved—all of whom took active part and/or failed to intervene to prevent fellow officers' use of obviously excessive force—makes clear that their actions were caused by EPSO's training, customs, policies, and practices.

184. Of particular importance, the active and observational involvement of multiple Sergeants in the overwhelmingly excessive force and their failure to intervene to prevent or reduce it, also proves that the concerted use of force was pursuant to and caused by EPSO's official and/or de facto training, customs, policies, and practices.

185. In addition to the excessive force used against Mr. Lemuel, EPSO's custom of excessive force and the absence of an adequate use of force policy, training, supervision, and discipline is evidenced by the following incidents.

186. On September 26, 2007, an EPSO deputy used excessive force in unjustifiably placing CJC detainee Brock John Behler in a bear-hug type and throwing him to the floor, breaking Mr. Behler's arm. El Paso County settled a civil rights claim based on the incident for in 2010. EPSO defended that case by claiming that the defendants' actions were within the training and policy of the County.

187. On October 6, 2009, an EPSO SWAT team used excessive force against Rose

Santistevan, then-69 years old, when storming into her home. Although Ms. Santistevan's house contained numerous signs warning she used oxygen, deputies forced their way in, battering in her door with a ram, shattering glass all over her living room, and charging in while displaying automatic weapons. They also detonated a flash bang. EPSO deputies seized Ms. Santistevan at gunpoint as her home filled with smoke. Ms. Santistevan was rushed to the hospital for respiratory and heart problems and spent a week recuperating there. El Paso County settled a lawsuit based on the incident in 2013. EPSO defended that case by claiming that the defendants' actions were within the training and policy of the County.

188. On September 13, 2011, EPSO Deputy Marcus Miller used excessive force when he shot and killed Christine Vargas as she tried to drive away from him and two other deputies. El Paso County settled a civil rights lawsuit based on this incident in 2015. The EPSO and the Fourth Judicial District Attorney's Office condoned and ratified Deputy Miller's excessive use of lethal excessive force, and the other two deputies' unconstitutional failure to intervene. Deputy Miller was cleared of criminal wrongdoing, and as of August 2015, Deputy Miller remained employed on the force. The two other deputies involved in the fatal incident were later promoted to detective and sergeant.

189. On June 11, 2013, EPSO Deputy Patrick Smith used excessive force in attacking CJC detainee Robert Montoya without any provocation, striking Mr. Montoya in the face, pushing him into a wall, beating him and sitting on him. Not only was Mr. Montoya seriously injured, but just as in Mr. Lemuel's case, CJC correctional officers then acted with deliberate indifference to the serious medical injuries they themselves had caused by refusing him medical treatment for his injuries. El Paso County settled a civil rights lawsuit based on this incident in 2015. EPSO condoned and ratified Deputy Smith's use of excessive force and deliberate

indifference by retaining him on the force. EPSO defended that case by claiming that the defendants' actions were within the training and policy of the County.

190.     In 2014, CJC detainee Philippa McCully suffered similar unconstitutional treatment at the hands of EPSO deputies. Like Mr. Lemuel, Ms. McCully was walked to the back of a Cell 3 by two EPSO deputies and a lieutenant. Without warning or provocation, while Ms. McCully was defenseless and facing the back wall of the cell, one deputy without warning violently yanked Ms. McCully's legs out from under her, while another deputy slammed her upper body and head to the ground. As Ms. McCully screamed in pain, the deputies unnecessarily piled their entire bodyweight on top of her tiny, 100-pound frame. The EPSO employees' conduct resulted in severe injuries to Ms. McCully, including but not limited to a fractured left knee, left knee hyperextension with bone contusion, left anterior cruciate ligament (ACL) avulsion tear, torn left posterior cruciate ligament (PCL), left posterior joint capsular tear, extensive, deep bruising on the fronts and backs of her legs and blunt trauma to her face, head and upper body. In 2018, El Paso County and Correct Care Solutions (the former private, for-profit medical care provider at CJC) settled a lawsuit based on the incident for a total of $800,000. Defendant Kim Miller herein was also a named defendant in the *McCully* case. EPSO defended that case by claiming that the defendants' actions were within the training and policy of the County.

191.     At the time of Ms. McCully's detention and dating back to at least 2012, EPSO employees in the Intake Section of CJC were engaged in a **competition** to determine who could inflict the most uses of force on detainees and inmates. This competition was dubbed "Fight Club" by those at CJC. EPSO officers compared and counted uses of force, and the CJC employee who engaged in the most uses of force was determined to be the winner.  One year

(2014), the "Champion" was feted and awarded a cake and tiara. After this competition was revealed through a whistleblower and also through the filing of Ms. McCully's litigation, EPSO undertook an "investigation" with the obvious goal of covering up or whitewashing the circumstances.

192.    Though some of the involved employees received letters of counseling or written reprimands, no substantial discipline was imposed—no EPSO employee involved in the competition lost even a day's pay. Moreover, the EPSO insisted that there had not, in fact, been a competition, despite clear evidence of deputies comparing and counting their uses of force and the existence of the award party to the winner.

193.    Consistent with Fight Club, an Organizational Assessment of EPSO conducted by an outside organization on June 17, 2015, found that between 2010 and 2014, incidents of use of force against inmates by EPSO correctional officers saw a dramatic rise:

| YEAR | # USE OF FORCE REPORTS |
|------|------------------------|
| 2014 | 458 |
| 2013 | 322 |
| 2012 | 272 |
| 2011 | 261 |
| 2010 | 130 |

194.    Despite the nominal conclusion of Fight Club, use of excessive force by EPSO officers continued to be customary at CJC thereafter.

195.    For instance, in 2017, after Thomas Ryan Dole's jaw and back had been broken during a physical altercation with other CJC inmates, EPSO officers used unnecessary physical force against him despite knowing about his injuries, including an EPSO officer purposefully

placing his hands directly on Mr. Dole's broken jaw and shoving it against a wall.

196.    On September 7, 2017, a 40-year-old man named Eliezer Tirado-Ortiz was brought into CJC while experiencing a drug-related medical crisis. He was heavily sweating and speaking rapidly about heroin and methamphetamine. Once he was inside the jail, he screamed at CJC officers, and in response, at least six officers physically restrained him. Just as they were trained to do, and pursuant to policy and practice, the officers unjustifiably and with the use of excessive force pushed Mr. Tirado-Ortiz onto his stomach, piled their bodyweight on his back, held down his arms and legs, and struck him with their hands and knees—almost identical actions to those EPSO officers took less than a year later against Mr. Lemuel. After ten minutes, the deputies placed him on his side, but he appeared unconscious. CJC staff attempted to revive him, but Mr. Tirado-Ortiz was dead. The El Paso County Coroner's Office ruled his death a homicide based on the force used against him.

197.    The District Attorney of the Tenth Judicial District cleared the involved officers and nurses of any wrongdoing in the death of Mr. Tirado-Ortiz, despite a March 16, 2018, report by the DA's office that indicated grave shortcomings in the actions of the involved EPSO deputies and Armor employees. Many of the failures noted by the March 16, 2018, report are extremely similar to the actions and omissions by EPSO and Armor employees that resulted in the death of Mr. Lemuel. For example, the report stated the six deputies who had contact with Mr. Tirado-Ortiz recognize the repeated signs of medical distress and admitted they weren't trained to identify and respond to such cases; it further stated that the deputies observed that Mr. Tirado-Ortiz's behavior was consistent with someone high on methamphetamine, but did not administer any medication. Then, when Mr. Tirado-Ortiz told deputies he could not breathe and complain about his chest, which the report stated should have been a clue of a problem, the

deputies continued to use force against him.

198. Upon information and belief, El Paso County and Armor likewise did not discipline the involved employees for their roles in Mr. Tirado-Ortiz's death. The estate of Mr. Tirado-Ortiz brought a lawsuit against El Paso County and individual defendants in August 2019 for the death of Mr. Tirado-Ortiz; the lawsuit remains pending.

199. In 2018, an EPSO deputy at CJC woke Heshimo Carr in his cell and punched Mr. Carr in the head and abdomen for no legitimate reason. Mr. Carr suffered injuries to his face and abdomen, as well as neck pain. El Paso County settled a lawsuit based on the incident. EPSO defended that case by claiming that the defendants' actions were within the training and policy of the County.

200. Showing that the use of excessive force was customary and at least tolerated, if not encouraged or rewarded, by EPSO, the pervasive use of excessive force has continued since Mr. Lemuel was killed in CJC.

201. For example, in June 2019, 57-year-old Terry Wayne West was booked into the CJC. While detained, he suffered a medical emergency. In response to this medical emergency, multiple deputies used excessive force in restraining Mr. West, shackling and handcuffing him, as they are trained to do. After they restrained him, Mr. West became unresponsive and died. Like Mr. Lemuel and Mr. Tirado-Ortiz, the circumstances of Mr. West's death reveal an alarming pattern in CJC of EPSO officers using overwhelming and unjustified force and prolonged restraint against individuals who are vulnerable while suffering medical crises.

202. Based on the uses of force incidents detailed above and many others, and the absence of accountability and adequate training and supervision, Defendant El Paso County knew or had constructive knowledge that EPSO officers used and would continue to use

excessive force.

203.    EPSO has not modified its training practices or policies as a result of the many instances of death or serious bodily injury resulting from EPSO officers' use of force. Such intransigence, especially coupled with the aggressive defense of such tactics after such tragedies have occurred, constitutes a "doubling down" on the part of EPSO and the County regarding these customs, practices, and policies, further demonstrating that such conduct is attributable to the County as it is how its officers are trained and expected to behave.

204.    In light of this knowledge, Defendant El Paso County could have and should have changed its use of force policy and practices and/or pursued reasonable methods for training, supervising, and disciplining EPSO officers regarding the use of force, but it made a deliberate choice not to do so and instead has fostered a "policy of inaction." This "policy of inaction" has caused additional instances of excessive force and constitutional violation, including the use of excessive force and failure to provide medical care in the case of Deramus Lemuel.

205.    Defendant El Paso County's unlawful conduct amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

206.    EPSO's failure to discipline any of the Individual EPSO Defendants for their use of excessive force against Mr. Lemuel demonstrates that their conduct was carried out pursuant to the customs, policies, practices, and regiment of training of EPSO, and that such conduct is customary within EPSO.

207.    Because Defendant El Paso County created and tolerated a custom of using excessive force and it has continuously failed, despite the obvious needs to do, to adequately train, discipline, and supervise EPSO officers in this area, individuals including Mr. Lemuel have

repeatedly been subjected to violations of their constitutional rights.

208.    Defendant El Paso County knew or should have known that its acts or omissions in the area of use of force were substantially certain to cause EPSO officers to violate individuals' constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of, among other things, failing to provide additional or better training and supervision to EPSO officers regarding the use of force.

209.    The circumstances in this case, where the jail receives a detainee whose faculties were impaired by the ingestion of drugs or other substances, and whose behavior may be adversely affected by such substances, are commonly recurring and foreseeable circumstances in the jail and correctional setting.

210.    The need for such training and the probability that the failure to provide such training would cause a CJC inmate like Mr. Lemuel to die or be seriously injured was so obvious that Entity Defendants' failure to do so constituted deliberate indifference to Mr. Lemuel's constitutional right to be free from excessive force or subject to the deprivation of necessary medical care.

211.    Defendant El Paso County was deliberately indifferent to Mr. Lemuel's constitutional rights because El Paso County knew that individuals in Mr. Lemuel's position would be at substantial risk of suffering dangerous consequences from, among other things, its failure to adequately train and supervise EPSO officers regarding the use of force and provision of necessary medical care.

212.    The El Paso County policy, custom, or practice described above was a moving force and proximate cause of Individual EPSO Defendants violating Mr. Lemuel's constitutional right to be free from excessive force.

213. Defendant El Paso County's customs, policies, and /or practices as set forth herein caused Mr. Lemuel's death and substantial damages to Plaintiffs.

**Defendants El Paso County's and Armor's customs, policies, and/or practices of deliberate indifference to inmates' serious medical needs caused Mr. Lemuel's death and the violation of his constitutional rights.**

214. At all times relevant to the subject matter of this Complaint, Defendant El Paso County contracted with Armor to provide medical care and services to detainees at CJC, as well as medical personnel.

215. Defendants El Paso County and Armor maintained constitutionally deficient policies and practices and neglected to adequately train and supervise their employees with respect to the proper procedures for the evaluation and treatment of CJC detainees' and inmates' serious medical needs.

216. It was well known by the Entity Defendants prior to Mr. Lemuel's death that there was a widespread pattern and practice of deliberately indifferent medical care at CJC, as well as other facilities at which Armor provided medical services.

217. The Individual EPSO Defendants' and Medical Defendants' violation of Mr. Lemuel's Fourteenth Amendment right to be free from deliberate indifference to his medical needs, standing alone, is sufficient evidence of the Entity Defendants' custom, policy, or practice of deliberate indifference because all individual Defendants acted in essentially the same unconstitutional manner, each adhering to what he or she based upon training knew to be standard operating procedure, policy, and customary practice.

218. The Entity Defendants' policy and/or custom of deliberate indifference and their lack of adequate training, supervision, and discipline regarding meeting the serious medical needs of those in custody at CJC is further evidenced by the following incidents:

219.     On January 7, 2013, Christopher Spencer nearly died after being shot in the chest during an attempted robbery in Colorado Springs. Mr. Spencer was transferred from a hospital to CJC on February 15, 2013. Because of the gunshot wounds, Mr. Spencer's circulation was compromised, and his feet began to swell. Gangrene ultimately caused Mr. Spencer's feet and toes to visibly fester with sores and rendered him unable to walk without debilitating pain. EPSO officers refused to obtain medical care for Mr. Spencer despite repeated requests for help, and it was not until Mr. Spencer left CJC on April 16, 2013, that he received proper medical care. By then, however, his toes and part of his left foot had to be amputated due to EPSO officers' deliberate indifference to Mr. Spencer's obvious and serious medical needs. A lawsuit based on this incident was later filed against El Paso County and the individual officers involved.  EPSO defended that case by claiming that the defendants' actions were within the training and policy of the County.

220.     As detailed above, in June 2013, CJC staff turned a blind eye to Mr. Montoya's serious medical injuries that were caused by Deputy Patrick Smith's unprovoked attack against Mr. Montoya. Due to the EPSO's deliberate indifference to Mr. Montoya's serious medical needs, Mr. Montoya suffered deteriorating and severe injuries. EPSO determined that its employees' actions were within the training and policy of the County.

221.     Similarly, in Ms. McCully's case, immediately after the CJC officers severely injured her in 2014, Ms. McCully screamed out in pain that they had broken her leg. Even so, the officers who were present did not ensure that she received obviously necessary medical treatment. She then suffered excruciating, untreated pain for the rest of the five days that she remained in custody at CJC. Despite her obvious pain and inability to walk properly on her injured leg, she was never even given over-the-counter pain relief medication let alone more

significant and necessary medical intervention.  As noted previously, demonstrating that the injuries she suffered were caused by municipal policy, EPSO aggressively defended the propriety of its employees' actions, insisting that such conduct was standard operating procedure and how the employees were trained, even while paying out $675,000 of the $800,000 total settlement to Ms. McCully.

222.    After Defendant Armor was hired by El Paso County to provide medical services to CJC inmates on July 15, 2017—winning a contract worth potentially up to $40 million despite the fact that Armor at that time was a defendant in more than 100 pending lawsuits based on providing inadequate medical care to inmates and the fact that Armor had just been banned from New York correctional facilities after a string of inmate deaths (detailed below)—the substandard medical care in CJC foreseeably persisted.

223.    Examples showing Armor's constitutionally deficient conduct include that one of its El Paso County CJC employees caused a Hepatitis A outbreak at the jail, which infected four inmates at CJC and began when the employee did not follow contagious disease protocols.

224.    An audit of CJC by the National Commission on Correctional Health Care in the fall of 2018 resulted in CJC's accreditation being put on probation after it found numerous problems with Armor's services, including a backlog of medical requests that left more than 300 inmates without prompt access to medical care.

225.    Specific further examples of Armor's deficient care to inmates at CJC, often found in conjunction with EPSO officers' failure to provide adequate medical assistance, include but are not limited to the examples below, which show that Individual EPSO Defendants and the Medical Defendants' failure to provide timely and adequate medical care to Mr. Lemuel was part of a custom of deliberate indifference by EPSO and Armor.

226.     As described above, in September 2017, Eliezer Tirado-Ortiz was killed in CJC, while suffering a known drug-related medical crisis. After CJC officers used overwhelming force against him—in a very similar way to the force used against Mr. Lemuel—an Armor nurse and the involved EPSO officers failed to immediately begin resuscitation attempts after Mr. Tirado-Ortiz became obviously unresponsive.  Armor determined that its employees acted pursuant to and within its policies and standard operating procedures. However, in a "notice of concern" El Paso County sent to Armor about the incident, the County observed several shortcomings of the Armor nurses at the scene that were very similar to that of Defendant Nurses here. The report stated that the nurses did not take charge of the situation, leading to a delay in calling an ambulance and providing medical treatment. The letter concluded that the performance of medical staff "was below required standards."

227.     In October 2017, CJC inmate Madelyn Taylor Hemphill was forced to give birth on her own in an isolation cell after EPSO and/or Armor staff refused her medical assistance despite her cries for help. Ms. Hemphill's baby was born into a toilet, where she inhaled water and stopped breathing; although the baby was resuscitated, she developed an e-coli infection and was in the hospital for three months.  Armor determined that its employees acted within its policies and standard operating procedures.

228.     Also in 2017, Armor staff at CJC committed at least two botched emergency responses; in one instance, staff delayed putting a neck brace on a the patient and calling an ambulance, and in the other instance, the Armor nurse who responded to an inmate's medical emergency struggled to set up the oxygen tank and perform CPR.

229.     In December 2017, the National Commission on Correctional Health Care, which provides accrediting to correctional facilities, placed CJC on probation, based on an assessment

that CJC failed seven of 39 "essential standards," including emergency services. CJC also failed three "important" standards, including clinical performance enhancement, which evaluates the appropriateness of services delivered by patient care clinicians and nursing assessment protocols. The NCCHC probation was lifted on April 22, 2018 but noted that "clinical performance enhancement" remained subpar.

230. In February 2018, Don Woodson's leg was partially amputated when a dog bite he had suffered during arrest festered with gangrene while he was in custody at CJC. Armor and EPSO staff's deliberate indifference to his serious medical needs included failure to timely treat his leg.

231. In mid-2018, El Paso County notified Armor that it had serious concerns that Armor had delayed transport to the hospital for an inmate with large open wounds.

232. As noted in El Paso County's April 3, 2019, notice to Armor that Armor's performance of its contract with the County was deficient, *see infra* ¶ 249, in February 2019, a mistake by an Armor nurse left an inmate without prescribed medications for 10 days.

233. As described above, in June 2019, Terry West died at CJC after Armor staff witnessed and ignored warning signs, including complaints of chest pain and vomiting blood and Mr. West's calls for me help. In the six days he was detained at CJC before his death from a stomach ulcer hemorrhage, Mr. West repeatedly complained about his health problems to Armor nurses. Approximately 30 minutes before his death and after staff knew he had been vomiting blood and screaming in pain, Mr. West was brought into the medical section of CJC; although he was acting erratically, rather than provide immediate medical assistance or call for a hospital transfer, Armor staff allowed EPSO officers to restrain Mr. West with shackles and handcuffs. Mr. West died almost immediately after being restrained.

234.     Also in June 2019, CJC inmate Holly Peck attempted to kill herself by hanging. After Ms. Peck was discovered, Armor and EPSO staff did not provide adequate medical assistance in attempting to resuscitate her, and she did not regain a pulse until paramedics arrived; she was then taken to the hospital, where she died five days later.

235.     In August 2019, Joseph Lee Martinez was denied his prescription medication for 22 days, leading the court to continue his sentencing pending a competency evaluation ordered because Mr. Martinez reported delusional thoughts during the weeks he went without his medication. Recognizing the conclusion that this was a frequent occurrence at the jail, the Court blamed Armor for the delay, stating, "[t]his has been a common problem." The court was referencing, among other cases, that of James Papol, who had been diagnosed with schizophrenia and previously acquitted of criminal charges by reason of insanity, yet went eight days at CJC without receiving his antipsychotic medication, thereby delaying his competency evaluations.

236.     And in October 2019, Susan Cespedes died while incarcerated at CJC. In the weeks leading up to her death, Ms. Cespedes repeatedly requested medical assistance, to no avail. Armor staff at the jail was aware that Ms. Cespedes suffered from diabetes, kidney disease, high blood pressure, and other medical issues that could be deadly if untreated. Armor staff exhibited deliberate indifference to Ms. Cespedes by ignoring several red flags in the days before her death, including dangerously low blood pressure, struggling to eat, nausea, vomiting, and sharp pains in her right side. In response to these complaints, medical staff gave her only ibuprofen. By the time she was taken to the hospital, she had gone into shock and her organs had failed. A lawsuit was filed against El Paso County and Armor (and individual employees thereof) based on Ms. Cespedes' death; the lawsuit remains pending.

237.     Too late for Mr. Lemuel and the other inmates who were victims of Armor's

persistent pattern of constitutionally deficient care, Defendant El Paso County notified Armor on April 3, 2019 (about eight months after Mr. Lemuel died at the jail), that Armor had failed to comply with several contract requirements, warranting an immediate and strong action by Armor to cure multiple deficiencies. Specific deficiencies cited in the notice included, among other things, "alarming" staffing deficiencies that put inmates' health "in jeopardy"; El Paso County found that in reviewing 30 weekdays in 2019, on average, six Armor employees were absent each day, with as many as 11 staff members absent on some dates. Notably, as detailed below, before El Paso County hired Armor in 2017, Armor's staffing shortages at facilities where it provided medical services were known to cause it to provide constitutionally inadequate medical care to inmates at such facilities.

238.   El Paso County's April 3, 2019, notice stated that Armor's "failure to meet contract standards governing provision of general medical services, mental health services, and pharmacy services" and its "actions/inactions described [in the notice] unnecessarily subject[ed] [CJC's] inmates to significant physical and psychological danger and subject[ed] [El Paso] County & Armor to substantial civil liability due to the non-delegable obligation to provide medical care for its [sic] inmates."

239.   In June 2019, Armor informed El Paso County it was terminating the contract to provide services at CJC due to irreversible damage of the parties' relationship, which had begun to sour almost immediately after the ink was dry on the contract due to the deficient services provided by Armor (although Armor would continue to provide services through the end of 2019).

240.   In addition to the CJC-specific incidents described above, because Defendant Armor is a national company with a disgraceful history of failing to provide constitutionally

adequate medical care to inmates at correctional facilities at which it contracts, there is an abundance of examples nationwide establishing that the Armor and the entities that employ it have policies, customs, and practices demonstrating deliberate indifference to the medical needs and constitutional rights of inmates.

241.    For example, in 2010, Raymond Delgado was a pretrial detainee at St. John's County Jail in Florida, a facility in which Armor provided medical services. He had a family history of colon cancer and was over fifty years old. For over one-and-a-half years during his incarceration, he informed the medical staff at the jail countless times that he was experiencing strong abdominal pain. Despite multiple repeated pleas for help, he never received any evaluation or examination for colon cancer. By the time he was rushed to the hospital for emergency surgery to treat his colon cancer, due to Armor's deliberate indifference to his medical needs based on the long delay in proper examination, diagnosis, and treatment, Mr. Delgado's projected five-year survival rate dropped from 74% to 8%. A lawsuit based on the incident was settled shortly before trial. Armor maintained that it had done nothing wrong and that its employees acted within policy and customary practice.

242.    In November 2010, Austin Clary was incarcerated in Brevard County Jail in Florida, another facility at which Armor provided medical services. Mr. Clary notified the jail staff and Armor staff that he suffered from hypokalemic periodic paralysis, which required regular doses of prescription medication. Armor staff refused to provide his medication despite repeated requests. As a result of Armor employees' deliberate indifference to Mr. Clary's serious medical needs, Mr. Clary became progressively more paralyzed, to the point that paramedics were forced to take him to a hospital, where he was placed in intensive care due to dangerous potassium levels. A case based on the incident was settled in 2014.  Armor maintained that it had

done nothing wrong and that its employees acted within policy and customary practice.

243.    In 2012, Allen Hicks died in Orient Road Jail (run by the Hillsborough County Sheriff's Office) in Florida after he suffered a stroke. Despite being incoherent and unable to move his left arm when he was booked into the jail, Armor staff who provided medical services at the jail did not provide Mr. Hicks a medical screening but rather stood by while deputies took Mr. Hicks to a cell and placed him face down on a mattress. Armor's deliberate indifference to Mr. Hicks' serious and obvious medical needs included the failure to provide any medical treatment during the 36 hours Mr. Hicks spent in the jail, before he was belatedly taken to the hospital. Armor paid $800,000 to Mr. Hicks' estate to settle a claim against Armor and its staff based on the incident.  Throughout that litigation, Armor maintained that it had done nothing wrong and that its employees acted within policy and customary practice.

244.    Also in 2012, Raleigh Preister died from starvation at a Boward County jail where Armor provided medical services; he died after withering to half his body weight during 155 days in jail. During that time, jail staff, including Armor employees, showed deliberate indifference to Mr. Preister's medical needs by deliberately ignoring his mental health and physical ailments and failing to provide him with necessary mediation. Armor settled a lawsuit based on the incident in 2015. Armor maintained that it had done nothing wrong and that its employees acted within policy and customary practice.

245.    In 2016, April Brogan died while detained at Volusia County Jail in Florida, at which Armor provided medical services. Despite Ms. Brogan suffering clearly observable symptoms of opiate withdrawal, as well as her cellmates' repeated requests to jail staff to help Ms. Brogan, Armor staff exhibited deliberate indifference to Ms. Brogan's serious medical needs in failing to provide her with necessary treatment for withdrawal during the three days between

her booking and death. A lawsuit based on Ms. Brogan's death was brought against Armor, its staff, and other defendants in 2017.  Armor has maintained that it had done nothing wrong and that its employees acted within policy and customary practice.

246.    In 2016, John Kinlaw, a detainee at Lunenburg Correctional Center in Virginia, at which Armor provided medical services, fractured his hand. The facility's doctor, who was an Armor contractor, only gave him an ice pack and Motrin despite X-rays showing that he needed more significant medical attention. In the weeks that followed, despite Mr. Kinlaw notifying the doctor and Armor-employed nurses that he needed further medical attention, it was not provided. Mr. Kinlaw was not taken to an orthopedic specialist for 100 more days, who concluded Mr. Kinlaw's hand had healed wrong and could only be fixed by surgery, if at all. A jury awarded Mr. Kinlaw over $1 million dollars against Armor and its staff in 2019. Armor maintained that it had done nothing wrong and that its agents acted within policy and customary practice.

247.    In August 2016, Kristine Fiebrink, detained in Milwaukee County Jail in Wisconsin, a facility at which Armor provided medical care and services, died due to heroin and alcohol withdrawal. Despite exhibiting signs and symptoms of acute heroin and alcohol intoxication, Armor staff exhibited deliberate indifference to Ms. Fiebrink's obvious and serious medical needs in failing to place Ms. Fiebrink on preventative detoxification protocol, allow Ms. Fiebrink to see a doctor, or provide her with withdrawal medication or heightened observation. A lawsuit based on Ms. Fiebrink's death was filed in 2018.

248.    In October 2016, Michael Madden died at the Milwaukee County Jail of an infected heart with inflammation; Mr. Madden had told jail staff when he entered the jail a month earlier that he had a heart defect and was an intravenous drug user, leaving him at high risk for infective endocarditis. Despite this information and Mr. Madden's showing obvious

signs of this condition during his detention, Armor and its employees acted with deliberate indifference to Mr. Madden's serious medical needs in failing to provide him with the necessary treatment. Armor staff also acted with deliberate indifference in failing to immediately obtain emergency medical treatment for Mr. Madden on the day of his death, but rather responding to obvious signs of his medical distress with non-emergent treatment. A lawsuit based on Mr. Madden's death was filed in 2018.

249.     Also in 2016, Terrill Thomas, another inmate who was under Armor's care at the Milwaukee County Jail in Wisconsin, died from dehydration after he was locked in his cell without water for nearly a week, the result of jail staff turning off water to his cell. Despite Armor employees' knowledge of Mr. Thomas's severe mental health condition and history of bipolar disorder and their repeated observations of his experiencing a severe psychiatric issue or medical crisis, they failed to provide him with any medical or mental health care. A lawsuit based on Mr. Thomas's death against Armor, its employees, and other defendants was settled in 2019 for $6.75 million. Armor maintained that it had done nothing wrong and that its agents acted within policy and customary practice.

250.     Additionally, in 2018, the State of Wisconsin criminally charged Armor with seven misdemeanor offenses of intentionally falsifying a health care record based on allegations that Armor employees repeatedly falsely stated in health care records that they had provided medical care to Mr. Thomas during the week before his death. The State alleged that Armor employees thus engaged in a pattern and practice of intentionally falsifying entries in inmate patient health care records. The district court denied Armor's motion to dismiss the criminal charges, concluding that evidence in the criminal complaints clearly showed probable cause because, in part, "[t]he employees served a corporate goal of minimizing staffing cost at the

workplace." Armor continues to maintain that it had done nothing illegal and that it and its employees and agents acted within policy and customary practice.

251.    In August 2016, Charles Jones, an inmate at Brevard County Jail in Florida, died after his bowels burst and he went into septic shock. For weeks before his death, Mr. Jones had been complaining of severe stomach pain and other obvious and specific signs and symptoms of enterocolitis and/or bowel obstruction to the Armor medical personnel at the jail. Armor staff was deliberately indifferent in failing to assess Mr. Jones's symptoms and addressing his obvious and serious medical needs, leading to his death. A lawsuit based on Mr. Jones's death was filed in 2018.

252.    In 2016, the State of New York sued Armor over 12 inmate deaths in Nassau County Correctional Center since 2011. In five separate cases, state investigators found that inmates died due to inadequate medical care provided by Armor. These deaths were the result of Armor's and its employees' deliberate indifference to serious medical needs of Nassau County inmates, including but not limited to the failure to timely respond to inmates' medical needs, failure to provide reliable treatment, and chronic understaffing. Deaths caused by Armor's deliberate indifference at Nassau County Correctional Center included those of Roy Nordstrom, who died in 2011 after Armor staff refused to timely send him to a hospital when he exhibited serious signs of chest pain, had difficulty breathing, and collapsed; Bartholomew Ryan, who committed suicide in 2011 after Armor staff failed to provide adequate care for his known mental health needs (Mr. Ryan's estate was later awarded $7.9 million for Armor's negligence and deliberate indifference); Kevin Brown, who died in 2014 following inadequate treatment by Armor staff for his seizures and hallucinations; John Gleeson, who died in 2014 after Armor staff provided plainly ineffective and plainly inadequate treatment for an obvious heart condition; and

Antonio Marinaccio, who died in 2015 after suffering a medical emergency that occurred after a doctor employed by Armor refused to order diagnostic tests, provide medication, or physically examine Mr. Marinaccio despite a nurse noting significant and potentially serious health issues that required a doctor's immediate attention. The State's lawsuit was settled in 2016, after Armor agreed to pay a financial penalty and to be barred from working in New York for three years.

253.     In February 2018, Jimmy Anglin died in his Lake County Jail cell in Florida after Armor refused to provide him with medical care to treat his withdrawal from heroin. Mr. Anglin began vomiting less than 24 hours after being booked into the jail, and he told a guard that he "took a lot of heroin." When the guard notified the nurse on duty, an Armor employee, regarding Mr. Anglin's condition and statement, the nurse said she would see him in the morning. Due to the nurse's deliberate indifference to Mr. Anglin's obvious and serious medical needs, Mr. Anglin suffered a seizure later that night and ultimately died.

254.     In February 2019, Anthony Fennick died after his health declined over a period of one week while he was detained at Flager County Jail in Florida, a facility at which Armor provided medical services. Mr. Fennick had made numerous requests for medical assistance and complained of a headache, high fever, and other signs of potentially serious medical conditions until he suffered what appeared to be a seizure in his cell, immediately before which point he was delirious and severely disoriented. Despite Mr. Fennick's symptoms and multiple requests to nursing staff to see a doctor, the nurses refused to provide him with a timely doctor's visit and he never saw a doctor during his detention. Armor's deliberate indifference to Mr. Fennick's obvious and serious medical needs ultimately resulted in Mr. Fennick suffering a cardiac arrest and his death.

255.     Defendant El Paso County, in contracting with Armor to provide medical care at

CJC, knew or should have known of Armor's significant history and pattern of serious deficiencies in providing medical services and care to detention facility inmates. Defendant El Paso County is liable for the selection and years-long retention of Armor to provide medical services at CJC, which demonstrated shocking indifference to the health and safety of the inmates in its jail given what it knew to be a history of unconstitutionally inadequate medical care in correctional and detention facilities.

256.     Moreover, Defendant El Paso County has a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees, and is therefore liable for the unconstitutional actions of Armor and its employees toward Mr. Lemuel.

257.     Defendant El Paso County is also liable for its own custom of EPSO officers' deliberate indifference to CJC inmates' serious medical needs.

258.     Based on the numerous incidents detailed above of constitutionally deficient medical care and treatment provided by one or both of the Entity Defendants, Defendant El Paso County's lack of a constitutionally-adequate practices and policy regarding the need of EPSO officers to provide medical assistance to those against whom force has been used, and the absence of accountability and adequate training and supervision, the Entity Defendants knew or should have known that CJC staff—both EPSO officers and Armor employees—would display deliberate indifference to the serious medical needs of CJC inmates.

259.     In light of this knowledge, the Entity Defendants could have and should have changed their policies and/or pursued reasonable methods for training, supervising, and disciplining CJC staff regarding meeting the serious medical needs of CJC inmates, but the

Entity Defendants made a conscious and deliberate choice not to do so.[3]

260.    The Entity Defendants' unlawful conduct regarding their deliberate indifference in meeting the serious medical needs of inmates constitutes a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

261.    The Entity Defendants' failure to discipline or counsel any of the Individual EPSO Defendants or Medical Defendants for their deliberate indifference to Mr. Lemuel's serious medical needs demonstrates that their conduct was carried out pursuant to the customs, policies, practices, and regiment of training of EPSO and/or Armor, and that such conduct is customary with EPSO and/or Armor. Had such conduct not been customary and pursuant to approved policy, the Entity Defendants would have taken disciplinary or ameliorative action in response to Mr. Lemuel's death.

262.    Because the Entity Defendants created, tolerated and, at times, encouraged a custom of deliberate indifference to inmates' serious medical needs and continuously failed, despite the obvious need to do so, to adequately train, discipline, and supervise staff in this area, individuals including Mr. Lemuel have repeatedly been subjected to violations of their constitutional rights.

263.    The Entity Defendants knew or should have known that their acts or omissions in failing to provide adequate medical care to meet the serious needs of inmates were substantially certain to cause CJC staff (including EPSO and/or Armor employees) to violate individuals' constitutional rights, and the Entity Defendants consciously or deliberately chose to disregard

---

[3] El Paso County, by later terminating the contract of Armor as described above, has now taken some steps presumably designed to mitigate the risk of future injury to detainees, while at the same time reaffirming its own conclusion that the medical care provided by Armor to jail detainees was, as El Paso County had known for a long time, deficient. Unfortunately, this decision came too late to save Mr. Lemuel's life.

this obvious risk of harm in adhering to their policies and/or customs of, among other things, failing to provide additional or better training and supervision to CJC staff regarding meeting inmates' serious medical needs.

264.    The Entity Defendants were deliberately indifferent to Mr. Lemuel's constitutional rights because they knew that individuals in Mr. Lemuel's position would be at substantial risk of suffering dangerous consequences from, among other things, their failure to adequately train and supervise CJC staff in meeting the serious medical needs of inmates, yet they failed to take adequate action to rectify this deficiency.

265.    The circumstances attendant to Mr. Lemuel's detention and health crisis are foreseeable in the jail setting, sufficiently recurring as to place the Entity Defendants on clear notice that training, policies, and practices must be developed and enforced to avoid the violation of the constitutional rights of detainees who may be incarcerated at CJC.

266.    The need for such training and the probability that the failure to provide such training would cause a CJC inmate like Mr. Lemuel to die or be seriously injured was so obvious that Entity Defendants' failure to do so constituted deliberate indifference to Mr. Lemuel's serious medical needs.

267.    Mr. Lemuel's death was the result of longstanding, known systemic deficiencies in the medical care provided to inmates by the Entity Defendants, and the Entity Defendants' unconstitutional policies, customs, or practices described above regarding providing medical care to inmates were the moving force and proximate cause of Individual EPSO Defendants' and Medical Defendants' violating Mr. Lemuel's constitutional right to be free from deliberate indifference to his serious medical needs.

268.    The Entity Defendants' deliberate indifference to his serious medical needs

caused Mr. Lemuel's death and Plaintiffs' substantial damages.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### 14th Amendment – Excessive Force[4]
### (By the Estate Against Defendants El Paso County, LeBaron, Stubbs, Bell, Burgess, Miller, Rodriguez, Brienza, Young, Wright, Thorpe, and Bedia)[5]

269.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

270.     All Individual EPSO Defendants and the Medical Defendant sued under this claim, at all relevant times, were acting under the color of state law.

271.     Each Individual EPSO Defendant and Medical Defendant Bedia were at all relevant times acting within the course and scope of their official duties and employment.

272.     At the time of Mr. Lemuel's death, Mr. Lemuel had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be

---

[4] Plaintiffs bring this excessive force claim under the Fourteenth Amendment, because Mr. Lemuel was a pretrial detainee who had been arrested pursuant to an arrest warrant. *See McCowan v. Morales,* 945 F.3d 1276, at *10 n.6 (10th Cir. Dec. 27, 2019); *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 419 (10th Cir. 2014). The arrest warrant constituted a "judicial determination of probable cause" such that the Fourteenth rather than Fourth Amendment applies to Plaintiffs' excessive force claim. *See Booker*, 745 F.3d at 419 (explaining that a pretrial detainee is "one who has had a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest," and that the Fourteenth Amendment applies to excessive force cases brought by such detainees.) (internal quotation omitted). In any event, the standard for analyzing excessive force claims under both the Fourth and Fourteenth Amendment is objective reasonableness. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-74 (2015).

[5] Plaintiffs have not brought their First Claim for Relief against Defendant Nurse Bauer because, based on their current knowledge, Defendant Bauer was not present during, and did not observe, the use of force. However, if Plaintiffs later learn that Defendant Bauer was in fact aware of the use of force as it occurred, she is on notice that this claim is intended to be leveled against her as well, and Plaintiffs will amend the Complaint to assert this claim against Defendant Bauer.

secure in his person from unreasonable seizure through excessive force.

273.     Under the application of the specific facts and totality of circumstances as described fulsomely herein, Defendants violated the clearly established constitutional rights of Mr. Lemuel.

274.     Any reasonable law enforcement officer knew or should have known of this clearly established right at the time of Mr. Lemuel's death.

275.     No Individual EPSO Defendant at any time had a legally valid basis to seize Mr. Lemuel's person in the manner and with the level of force used under the circumstances present. The force was excessive.  Mr. Lemuel had committed no crime that would legally justify the amount and type of force used, he was obviously unarmed, and he was not resisting or fleeing.

276.     The above-named Individual EPSO Defendants (LeBaron, Stubbs, Bell, Burgess, Miller, Rodriguez, Brienza, Young, Wright, and Thorpe) and Medical Defendant Bedia engaged in or failed to intervene in the use of force that was objectively unreasonable in light of the facts and circumstances confronting them, violating Mr. Lemuel's Fourteenth Amendment rights.

277.     The above-named Individual EPSO Defendants and Medical Defendant Bedia unreasonably used or failed to intervene in the use of excessive force against Mr. Lemuel, resulting in his death.

278.     The above-named Individual EPSO Defendants and Medical Defendant Bedia unlawfully seized Mr. Lemuel by means of excessive force or caused Mr. Lemuel to be unlawfully seized by means of excessive force.

279.     The above-named Individual EPSO Defendants' and Medical Defendant's actions and omissions were objectively unreasonable in light of the circumstances confronting them.

280.     Individual EPSO Defendants LeBaron, Stubbs, Bell, Burgess, Miller, Brienza,

and Young ("Direct Participation Defendants") are liable for the use of excessive against Mr. Lemuel based on their direct participation in using excessive force.

281.    Individual EPSO Defendants LeBaron, Stubbs, Bell, Burgess, Miller, Rodriguez, Brienza, Young, Wright, and Thorpe and Medical Defendant Media ("Failure to Intervene Defendants") are liable for the use of excessive force against Mr. Lemuel for failing to intervene and protect Mr. Lemuel from harm at the hands of the Direct Participation Defendants.

282.    At all relevant times, the Failure to Intervene Defendants had a duty to protect Mr. Lemuel, a detainee in custody at CJC, from harm and unconstitutional treatment at the hands of CJC staff.

283.    The Failure to Intervene Defendants knew or reasonably should have known that the Direct Participation Defendants presented an excessive risk of harm to Mr. Lemuel, yet none of the Failure to Intervene Defendants took reasonable steps to protect Mr. Lemuel from the objectively unreasonable use of force by the Direct Participation Defendants, despite being in a position and having an opportunity to do so. Each Failure to Intervene Defendant is therefore liable for the damages resulting from the objectively unreasonable forced used by the Direct Participation Defendants.

284.    Defendants Miller, Rodriguez, and Wright ("Supervisory Defendants") were the Sergeants on site when the Direct Participation Defendants subjected Mr. Lemuel to excessive force.

285.    At all relevant times, the Supervisory Defendants possessed supervisory authority over Direct Participation Defendants LeBaron, Stubbs, Bell, Burgess, Brienza, and Young.

286.    At all relevant times, Defendants Miller, Rodriguez, and Wright had a legal duty to properly supervise Direct Participation Defendants LeBaron, Stubbs, Bell, Burgess, Brienza,

and Young. They failed to do that here by, inter alia, failing to properly direct the conduct of their subordinates, failing to enforce proscriptions against the use of excessive force, failing to properly prepare to receive Mr. Lemuel at CJC under the known circumstances, failing to order that medical care rather than physical force be utilized, failing to order the return of Mr. Lemuel to Memorial Hospital, and/or failing to intervene to stop their subordinates' excessive use of force despite knowing or reasonably should have been knowing that the Direct Participation Defendants presented an excessive risk of harm to Mr. Lemuel, and knowing that they were inflicting excessive force on Mr. Lemuel.

287. The Failure to Intervene Defendants and the Supervisory Defendants caused Mr. Lemuel to be deprived of his constitutional right to be free from excessive force because, by failing to protect Mr. Lemuel from the use of excessive force by the Direct Participation Defendants, and the Failure to Intervene Defendants and the Supervisory Defendants set in motion a series of events that they knew or reasonably should have known would cause the Direct Participation Defendants to deprive Mr. Lemuel of his constitutional rights.

288. The acts and omissions in which the Individual EPSO Defendants engaged were because of and pursuant to the custom, policy, training, and/or practice of Defendant El Paso County.

289. As alleged in detail above, Defendant El Paso County has a custom, policy, and practice of encouraging, condoning, tolerating, ratifying, and even rewarding the use of excessive force by EPSO officers at CJC and elsewhere. This is manifested through, among other things, El Paso County's grossly inadequate training, supervision, and discipline of EPSO officers relating to the use of force.

290. Defendant El Paso County and the Supervisory Defendants were on notice of

EPSO's defective customs, policies, and/or practices before Individual EPSO Defendants' excessive use of force against Mr. Lemuel.

291. The need for additional and effective use of force policies, training, and/or supervision was obvious, and the Supervisory Defendants and Defendant El Paso County exhibited deliberate indifference to the known and substantial risk of harm to Mr. Lemuel and others by failing to create adequate use of force policies and/or to adequately train and/or supervise EPSO officers in the use of force.

292. The Supervisory Defendants' and Defendant El Paso County's failure to create and implement adequate use of force policies and/or to adequately train and/or supervise EPSO officers in the use of force was substantially certain to cause EPSO officers at CJC to violate the constitutional rights of CJC detainees like Mr. Lemuel to be free from excessive force, and these Defendants consciously or deliberately chose to disregard this risk in failing to change the use of force policies and/or adequately train and/or supervise EPSO officers in the use of force. These acts and/or omissions constituted a deliberate choice by the Supervisory Defendants and Defendant El Paso County among several alternatives to pursue a course of action regarding creating and implementing policies, training, and supervision in the area of use of force.

293. Defendant El Paso County and Supervisory Defendants set in motion a series of events that they knew would cause an inmate in a similar situation as Mr. Lemuel to be deprived of his constitutional right to be free from excessive force.

294. But for the above acts or omissions of El Paso County and the Supervisory Defendants, Mr. Lemuel would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of these Defendants' acts and omissions.

295.    The herein described acts or omissions of Defendant El Paso County, the Direct Participation Defendants, the Failure to Intervene Defendants, and the Supervisory Defendants were the moving force behind the violation of Mr. Lemuel's constitutional right to be free from excessive force and proximate cause of his significant injuries, damages and losses.

296.    The herein described acts or omissions of the Defendant El Paso County, the Direct Participation Defendants, the Failure to Intervene Defendants, and the Supervisory Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Lemuel's death, the physical and mental pain and anguish Mr. Lemuel suffered before and during his death, the loss of Mr. Lemuel's constitutional rights, loss of enjoyment of life, and other compensatory and special damages including but not limited to permanent lost earnings and earnings capacity of Mr. Lemuel.

297.    The herein described acts and inactions were taken by the Individual EPSO Defendants and Medical Defendant Bedia in reckless and callous indifference to the federally protected rights of Mr. Lemuel, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Lemuel's constitutionally-protected rights.

298.    The intentional actions or inactions of Defendant El Paso County, each Individual EPSO Defendants, and Medical Defendant Bedia as described herein intentionally deprived Mr. Lemuel of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**14th Amendment – Failure to Provide Adequate Medical Care and Treatment**
**(By the Estate Against All Defendants)**

299.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

300.    At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

301.    At all relevant times, the described conduct of the Individual EPSO Defendants and Medical Defendants ("Individual Defendants") was taken within the course and scope of their official duties and employment.

302.    Defendant Armor and its agents, at all relevant times, was acting under color of state law, as the functional equivalent of a municipality providing medical care to detainees.

303.    At all relevant times, Mr. Lemuel was a pretrial detainee subject to the protections of the Fourteenth Amendment to the United States Constitution.

304.    Mr. Lemuel had a clearly established right under the Fourteenth Amendment to be free from deliberate indifference to his known serious medical needs and to receive adequate medical care while in the custody of EPSO.

305.    Under the Fourteenth Amendment, Mr. Lemuel was protected from conduct that was not rationally related to a legitimate nonpunitive governmental purpose or actions that appear excessive in relation to that purpose under *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

306.    To the extent he was under any conviction, Mr. Lemuel was also protected from deliberate indifference to his known serious medical needs and to be free from excessive force, by the Eighth Amendment to the United States Constitution.

307.    Each Individual Defendant knew or should have known of these clearly established rights at the time of Mr. Lemuel's arrival at the El Paso CJC.

308.    Under the application of the specific facts and totality of circumstances as

described fulsomely herein, Defendants violated the clearly established constitutional rights of Mr. Lemuel.

309. An objective reasonableness standard applies to Mr. Lemuel's claims against the Defendants for their denial of adequate medical care to him.[6] He had not been arraigned for any criminal offense and was not in EPSO custody because of an adjudication of guilt within a criminal context. However, for the reasons amply described above and herein, Defendants also had the subjective mental state of deliberate indifference to Mr. Lemuel's serious and obvious medical needs.

310. Mr. Lemuel was in obvious and serious need of medical care and treatment upon his arrival at CJC. Defendants failed to provide such medical care, and instead engaged in (or allowed others to engage in) excessive force to restrain and punish him for his involuntary presentation of symptoms of substance intoxication.

311. Mr. Lemuel was again in obvious need of medical care and treatment after he was forcibly restrained and beaten, which constituted the unjustified infliction of excessive force, as described more fully herein. Defendants again were deliberately indifferent to this urgent and serious need for medical care and treatment.

312. The Individual Defendants made intentional decisions with respect to the

---

[6] *See, e.g.*, *Miranda v. Cty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). The Tenth Circuit has noted that there exists a circuit split whether to apply *Kingsley* to claims alleging that pretrial detainees received inadequate medical care, but the Tenth Circuit has not itself decided the issue. *See McCowan v. Morales*, 945 F.3d 1276 n.12 (10th Cir. 2019). However, at least one District of Colorado court has applied *Kingsley* to eliminate the subjective inquiry in conditions of confinement cases brought by pretrial detainees. *See Eaves v. El Paso Cty. Bd. of Cnty. Comm'rs*, No. 16-cv-01065, 2017 U.S. Dist. LEXIS 43307, at *16-17 (D. Colo. March 24, 2017). So too has at least one other district court in this circuit. *See Abila v. Funk*, 220 F. Supp. 3d 1121, 1180-82 (D. N.M. 2016).

conditions under which Mr. Lemuel was confined. They deliberately and intentionally withheld the medical care he needed.

313.    These conditions put Mr. Lemuel at a substantial risk of suffering serious harm.

314.    The Individual Defendants failed to intervene and/or take reasonable available measures to abate the serious and obvious risk to Mr. Lemuel. A reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the Individual Defendants' conduct obvious.

315.    The Individual Defendants' conduct was objectively unreasonable. At all times relevant to the allegations in this Complaint, each Individual Defendant knew of and disregarded the excessive risks associated with Mr. Lemuel's serious and life-threatening medical condition.

316.    With deliberate indifference to Mr. Lemuel's constitutional right to adequate medical care for his known serious medical needs, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Individual Defendants knowingly failed to adequately and timely examine, treat, monitor, supervise, and/or obtain emergency care for Mr. Lemuel's emergent medical needs, or to intervene to ameliorate the other defendants' deliberate indifference to the obvious serious medical needs of Mr. Lemuel. They did so despite their knowledge of Mr. Lemuel's serious medical needs, thereby placing him at risk of serious physical harm, including death.  Therefore, the Individual Defendants knew or were aware that Mr. Lemuel faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

317.    By not taking such measures, the Individual Defendants caused Mr. Lemuel's injuries and death.

318.    As described with particularity above, the Entity Defendants are liable for their

deliberately indifferent policies, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the serious medical needs of detainees like Mr. Lemuel. The Entity Defendants have a widespread pattern of deliberately indifferent medical care at CJC and, as to Defendant Armor, other correctional facilities at which it provides medical services.

319.    Defendant El Paso County is directly liable for its own deliberately indifferent policies, customs, and practices that were moving forces in Mr. Lemuel's constitutional injury, as well as its deliberately indifferent training and supervision of nurses, its own role in setting policy regarding medical care at CJC, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference to CJC detainees known serious medical needs.

320.    Defendant El Paso County is also liable under the nondelegable duty doctrine for the deliberately indifferent policies, customs, practices, training and supervision of the private companies with which it contracts to provide medical care to CJC detainees, including Armor.

321.    As described in detail above, the Entity Defendants' deliberately indifferent policies, customs, practices, and/or failures to adequately train and/or supervise were moving forces in the violation of Mr. Lemuel's constitutional rights.

322.    The Entity Defendants were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

323.    The Entity Defendants' failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Lemuel.

324.     The Entity Defendants, through policy makers and final delegated decision-makers, ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious and known medical conditions.

325.     The ratification of the conduct that caused the death of Mr. Lemuel is not alleged as proof that this ratification itself "caused" his death.  Rather, it evidences that the conduct that caused Mr. Lemuel's death was engaged in pursuant to policy, custom, and practice of the Entity Defendants; had it been *outside* of policy, disciplinary or remedial action would have been taken.

326.     Ratification of *previous* instances of excessive force or deliberate indifference to medical needs, however, was a causal factor in the subsequent use of excessive force or deliberate indifference to medical needs regarding Mr. Lemuel, as the employees of the Entity Defendants are trained and taught that such conduct is acceptable and within policy when it happens and management takes no disciplinary and remedial action in response.

327.     Therefore, the Entity Defendants set in motion a series of events that they knew would cause an inmate in a similar situation as Mr. Lemuel to be deprived of his constitutional right to adequate medical care for his known serious medical needs.  But for the above acts or omissions of the Entity Defendants, Mr. Lemuel would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of these Defendants' acts and omissions.

328.     The Entity Defendants' policies, practices, habits, customs, widespread usages, and lack of adequate training and supervision that resulted in the failure to provide proper medical care to treat Mr. Lemuel's known serious medical needs were not rationally related to a legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

329. The herein described acts or omissions of each Defendant were the moving force and the legal and proximate cause of the violation of Mr. Lemuel's constitutional right to receive adequate medical care for his known serious medical needs.

330. The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Lemuel's death, the physical and mental pain Mr. Lemuel suffered before and during his death, the loss of Mr. Lemuel's constitutional rights, loss of enjoyment of life, and other compensatory and special damages including but not limited to permanent lost earnings and earnings capacity of Mr. Lemuel.

331. The herein described acts and inactions were taken by the Individual Defendants in reckless and callous indifference to the federally protected rights of Mr. Lemuel, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Lemuel's constitutionally-protected rights.

332. The intentional actions or inactions of each Defendant as described herein intentionally deprived Mr. Lemuel of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages.

**THIRD CLAIM FOR RELIEF**
**Negligence Causing Wrongful Death**
**Colo. Rev. Stat. §§ 13-21-201 *et seq.***
**(By Elizabeth Lemuel, individually, Z.D-L.M.L., D.J.L., D.S.L., and Z.A.T.L. Against Defendants Armor, Bedia, and Bauer)**

333. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

334.     At all times relevant, Armor was a private corporation that contracted with El Paso County to provide medical care and health services to inmates at CJC, and Armor is not entitled to immunity under the Colorado Governmental Immunity Act ("CGIA").

335.     At all times relevant, Defendants Bedia and Bauer were private individuals employed by Armor and thus not entitled to immunity under the CGIA.

336.     At all times relevant, Mr. Lemuel was in the involuntary custody of CJC, and under the medical responsibility, care and treatment of Defendants Armor, Bedia, and Bauer.

337.     The Medical Defendants had a duty to provide reasonable medical care and treatment to detainees at CJC, including Mr. Lemuel.

338.     The Medical Defendants had a nurse-patient relationship with Mr. Lemuel at all relevant times and were acting within the scope of their employment throughout the duration of that relationship.

339.     With respect to their care and treatment of Mr. Lemuel, the Medical Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.

340.     Armor had a duty to exercise reasonable care in providing medical care and treatment to CJC detainees, including Mr. Lemuel, and to exercise reasonable care in the training and supervision of Armor's employees.

341.     These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required medical treatment." The provision of adequate medical treatment and humane care is a statutory (as well as constitutional) obligation.

342.     The Medical Defendants breached their duty of care to Mr. Lemuel and deviated

from the standard of care they owed him when they failed to provide him with reasonably obtainable and necessary medical assessment, monitoring, care, and treatment.

343.    As a direct and proximate result of the Medical Defendants' breach of their duty to provide reasonable care and treatment to Mr. Lemuel, he suffered significant physical and mental pain and suffering and other damages and ultimately died.

344.    Armor is sued directly and indirectly for negligence, negligent supervision, and negligent training of its staff; for failing to ensure the provision of appropriate care in the treatment of Mr. Lemuel; for the acts and omissions of its agents and/or employees; and for the herein described acts by its involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

345.    Armor is vicariously liable for the negligent acts and omissions by its agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for negligent failures in training, policies, and practices.

346.    Armor is directly liable for breaching its duty to exercise reasonable care in its training and supervision of its employee and agents and CJC staff in a manner that provided CJC detainees with reasonable medical care and treatment.

347.    Armor knew or should have known that the lack of adequate supervision and training of its employees and agents and CJC staff was likely to harm CJC detainees in need of medical care, like Mr. Lemuel.

348.    In failing to exercise reasonable care in the training and supervision of its employees and agents and CJC staff, as it relates to their providing reasonable medical care and treatment, Armor was negligent and proximately caused Mr. Lemuel's death.

349.    The negligent acts and omissions by the Medical Defendants and Armor were a

substantial and significant contributing cause of Mr. Lemuel's death, and it was reasonably foreseeable that these Defendants' negligence would cause the harm or a similar harm that Mr. Lemuel and Plaintiffs have suffered and are and will suffering.

350. As a direct and proximate result of the conduct of the Medical Defendants and Armor, Mr. Lemuel suffered significant physical and mental pain and suffering and other damages, and ultimately died.

351. As a result of these Defendants' negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

352. Plaintiffs suffered and continue to suffer economic and non-economic damages due to these Defendants' negligent conduct, including but not limited to economic damages for funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. Lemuel had he lived, and non-economic damages for grief, loss of Mr. Lemuel's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

353. Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Mr. Lemuel and Plaintiffs.

354. Defendants' conduct as described herein constituted a felonious killing within the meaning of Colorado law.

355. Defendants consciously disregarded a substantial and unjustifiable risk that they

knew or should have known would cause the death of another.[7]

**FOURTH CLAIM FOR RELIEF**
**Negligence Causing Wrongful Death**
**Colo. Rev. Stat**. §§ **13-21-201** *et seq.*
**(By Elizabeth Lemuel, individually, Z.D-L.M.L., D.J.L., D.S.L., and Z.A.T.L. Against**
**Defendant El Paso County)**

356.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

357.    At all times relevant to this Complaint, El Paso County was responsible for the operation of CJC as a jail within the meaning of Colo. Rev. Stat. § 17-1-102.

358.    Pursuant to Colo. Rev. Stat. § 24-10-106(1)(b), El Paso County is not immune for acts or omissions of EPSO or EPSO employees taken during the operation of CJC.

359.    Plaintiffs provided the El Paso County Attorney with timely notice of claim on January 25, 2019, and El Paso County is not entitled to immunity under the CGIA for the negligent conduct of EPSO or its employees that caused the death of Mr. Lemuel.

360.    At all relevant times, the primary purpose of CJC was to safely and effectively confine inmates charged or convicted of crimes for the duration of their pending charges or sentence.

361.    As part of its operation of CJC, El Paso County was responsible for the provision of medical care necessary for basic health of CJC inmates.

362.    El Paso County had a statutory, constitutional, and common law duty to detain Mr. Lemuel in a safe manner, and to provide him with reasonable medical care and treatment.

---

[7] Given the circumstances of malice and willful and wanton conduct surrounding Defendants' treatment of Mr. Lemuel, Plaintiffs anticipate seeking exemplary damages for Defendants' negligence once Plaintiffs have established prima facie proof of a triable issue of exemplary damages.

363.    El Paso County had a duty to exercise reasonable care in the operation of CJC to ensure that EPSO and its employees exercised and performed the powers, duties, and functions vested in them by law in a manner that reasonably maintained the safety of CJC detainees and provided CJC detainees with reasonable and adequate medical care and treatment.

364.    El Paso County breached its duty of care to Mr. Lemuel and deviated from the standard of reasonable care it owed him.

365.    Defendants' conduct as described herein constituted a felonious killing within the meaning of Colorado law.

366.    El Paso County knew or should have known that CJC and EPSO employees at CJC operated the jail in manner likely to harm CJC detainees by, among other things, creating fostering, maintaining, and tolerating an environment and culture responsible for (1) the use of excessive force by EPSO officers against detainees at CJC and (2) the failure of CJC employees and staff to provide reasonable and adequate medical care and treatment to CJC detainees.

367.    In failing to exercise reasonable care in the operation of CJC, El Paso County was negligent.

368.    El Paso County is sued directly and indirectly for negligence, negligent supervision, and negligent training of its staff; for failing to reasonably ensure the safety of Mr. Lemuel and the provision of appropriate care in the treatment of Mr. Lemuel; for the acts and omissions of its agents and/or employees; and for the herein described acts by its involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

369.    El Paso County is vicariously liable for the negligent acts and omissions by its agents and/or employees, including, but not limited to, those named individually herein, and

those directly liable for negligent failures in training, policies, and practices.

370. El Paso County is directly liable for breaching its duty to exercise reasonable care in its training and supervision of its employee and agents and CJC staff in a manner that reasonably ensured the safety of CJC detainees and provided CJC detainees with reasonable medical care and treatment.

371. El Paso County knew or should have known that the lack of adequate supervision and training of its employees and agents and CJC staff was likely to harm CJC detainees like Mr. Lemuel.

372. In failing to exercise reasonable care in the training and supervision of its employees and agents and CJC staff, as it relates to their not using excessive force or allowing subordinates to use excessive force against CJC detainees and providing reasonable medical care and treatment, El Paso County was negligent and proximately caused Mr. Lemuel's death.

373. The negligent acts and omissions by El Paso County was a substantial and significant contributing cause of Mr. Lemuel's death, and it was reasonably foreseeable that El Paso County's negligence would cause the harm or a similar harm that Mr. Lemuel and Plaintiffs have suffered and are and will suffering.

374. As a direct and proximate result of the conduct of El Paso County, Mr. Lemuel suffered significant physical and mental pain and suffering and other damages, and ultimately died.

375. As a result of El Paso County's negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

376. Plaintiffs suffered and continue to suffer economic and non-economic damages due to these El Paso County's negligent conduct, including but not limited to economic damages for funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. Lemuel had he lived, and non-economic damages for grief, loss of Mr. Lemuel's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment for the Plaintiffs and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

(a)     Declaratory relief and injunctive relief, as appropriate;

(b)     Economic losses on all claims allowed by law in an amount to be determined at trial;

(c)     Compensatory and consequential damages, including, but not limited to those for past and future losses, damages for emotional distress, loss of enjoyment of life, funeral and related expenses, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(f)     Pre- and post-judgment interest at the highest lawful rate; and

(g)     Any further relief as justice requires and that this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 25th day of June 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*
_____
Darold W. Killmer
Michael Fairhurst
Liana Orshan
Reid Allison
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
dkillmer@kln-law.com
mfairhurst@kln-law.com
lorshan@kln-law.com
rallison@kln-law.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF REVIEW</u>

This is to certify that undersigned counsel has conferred, pursuant to Colo. Rev. Stat. § 13-20-602, with a medical professional who has expertise in the areas of alleged negligence and deliberate indifference to serious medical needs as set forth in the above Complaint; that this professional has reviewed the known facts, including such records, documents, and other materials relevant to the allegations of negligent acts and omissions; and he has concluded that the filing of these claims do not lack substantial justification within the meaning of Colo. Rev. Stat. § 13-17-102(4).

*/s/ Darold W. Killmer*
Darold W. Killmer